# WAGNON, SECRETARY, KANSAS DEPARTMENT OF REVENUE *v.* PRAIRIE BAND POTAWATOMI NATION

No. 04–631.   Argued October 3, 2005—Decided December 6, 2005

96

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, O'CONNOR, SCALIA, SOUTER, and BREYER, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which KENNEDY, J., joined, *post*, p. 116.

*Theodore B. Olson* argued the cause for petitioner. On the briefs were *Phillip Kline*, Attorney General of Kansas, and *John Michael Hale*, Special Assistant Attorney General.

*Ian Heath Gershengorn* argued the cause for respondent. With him on the brief was *David Prager III.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Clement, Acting Assistant Attorney General Johnson, Jeffrey P. Minear, M. Alice Thurston,* and *David C. Shilton.**

---

. *Briefs of *amici curiae* urging reversal were filed for the State of South Dakota et al. by *Lawrence E. Long*, Attorney General of South Dakota, and *John P. Guhin*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *David W. Márquez* of Alaska, *Bill Lockyer* of California, *Richard Blumenthal* of Connecticut, *Lawrence Wasden* of Idaho, *Michael A. Cox* of Michigan, *Jeremiah W. Nixon* of Missouri, *Brian Sandoval* of Nevada, *Patricia A. Madrid* of New Mexico, *Wayne Stenehjem* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *Thomas W. Corbett, Jr.,* of Pennsylvania, *Mark Shurtleff* of Utah, and *Pat Crank* of Wyoming; for the Multistate Tax Commission by *Frank D. Katz;* and for the National Association of Convenience Stores et al. by *William Perry Pendley* and *J. Scott Detamore.*

Briefs of *amici curiae* urging affirmance were filed for the Hoopa Valley Tribe et al. by *Thomas P. Schlosser* and *Rob Roy Smith;* for the Inter-Tribal Transportation Association by *Geoffrey D. Strommer, F. Michael Willis,* and *Charles A. Hobbs;* for the National Intertribal Tax Alliance et al. by *Richard A. Guest, Marcelino Gomez, Thomas Van Norman, Paul W. Shagen, Marjorie B. Gell, Gary S. Pitchlynn,* and *O. Joseph Williams;* for NCAI et al. by *Carter G. Phillips, Virginia A. Seitz, Reid Peyton*

JUSTICE THOMAS delivered the opinion of the Court.

The State of Kansas imposes a tax on the receipt of motor fuel by fuel distributors within its boundaries. Kansas applies that tax to motor fuel received by non-Indian fuel distributors who subsequently deliver that fuel to a gas station owned by, and located on, the Reservation of the Prairie Band Potawatomi Nation (Nation). The Nation maintains that this application of the Kansas motor fuel tax is an impermissible affront to its sovereignty. The Court of Appeals agreed, holding that the application of the Kansas tax to fuel received by a non-Indian distributor, but subsequently delivered to the Nation, was invalid under the interest-balancing test set forth in *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136 (1980). But the *Bracker* interest-balancing test applies only where "a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." *Id.*, at 144. It does not apply where, as here, a state tax is imposed on a non-Indian and arises as a result of a transaction that occurs off the reservation. Accordingly, we reverse.

I

The Nation is a federally recognized Indian Tribe whose reservation is on United States trust land in Jackson County, Kansas. The Nation owns and operates a casino on its reservation. In order to accommodate casino patrons and other reservation-related traffic, the Nation constructed, and now owns and operates, a gas station on its reservation next to the casino. Seventy-three percent of the station's fuel sales are made to casino patrons, while 11 percent of the station's fuel sales are made to persons who live or work on the reservation. The Nation purchases fuel for its gas station from non-Indian distributors located off its reservation. Those distributors pay a state fuel tax on their initial receipt of

*Chambers*, and *Riyaz A. Kanji;* and for the Sac and Fox Nation of Missouri in Kansas and Nebraska et al. by *Thomas Weathers*.

motor fuel, Kan. Stat. Ann. § 79–3408 (2003 Cum. Supp.),[1] and pass along the cost of that tax to their customers, including the Nation.[2]

The Nation sells its fuel within 2 cents per gallon of the prevailing market price. *Prairie Band Potawatomi Nation v. Richards*, 379 F. 3d 979, 982 (CA10 2004). It does so notwithstanding the distributor's decision to pass along the cost of the State's fuel tax to the Nation, and the Nation's decision to impose its own tax on the station's fuel sales in the amount of 16 cents per gallon of gasoline and 18 cents per gallon of diesel (increased to 20 cents for gasoline and 22 cents for diesel in January 2003). *Ibid.* The Nation's fuel tax generates approximately $300,000 annually, funds that the Nation uses for "'constructing and maintaining roads, bridges and rights-of-way located on or near the Reservation,'" including the access road between the state-funded highway and the casino. *Ibid.*

The Nation brought an action in Federal District Court for declaratory judgment and injunctive relief from the State's collection of motor fuel tax from distributors who deliver fuel to the reservation. The District Court granted summary judgment in favor of the State. Applying the *Bracker* interest-balancing test, it determined that the balance of state, federal, and tribal interests tilted in favor of the State. The court reached this determination because "it is undisputed that the legal incidence of the tax is directed off-reservation at the fuel distributors," *Prairie Band Potawatomi Nation v. Richards*, 241 F. Supp. 2d 1295, 1311 (Kan.

---

[1] The Kansas Legislature recently amended the fuel tax statute. 2005 Kan. Sess. Laws ch. 46. The text of the sections to which we refer remains the same, although the subsection numbers have changed. For consistency, our subsection references are to the 2003 version applied by the lower courts and cited by the parties.

[2] The record does not clearly establish whether the distributor passed along the cost of the tax to the Nation's gas station. At oral argument, petitioner acknowledged that the record was unclear, but represented that the distributor was in fact passing along the cost of the tax to the Nation.

2003), and because the ultimate purchasers of the fuel, non-Indian casino patrons, receive the bulk of their governmental services from the State, *id.*, at 1309. The court held that the State's tax did not interfere with the Nation's right of self-government, adding that "a tribe cannot oust a state from any power to tax on-reservation purchases by nonmembers of the tribe by simply imposing its own tax on the transactions or by otherwise earning its revenues from the tribal business." *Id.*, at 1311.

The Court of Appeals for the Tenth Circuit reversed. 379 F. 3d 979 (2004). It determined that, under *Bracker*, the balance of state, federal, and tribal interests favored the Tribe. The Tenth Circuit reasoned that the Nation's fuel revenues were "derived from value generated primarily on its reservation," 379 F. 3d, at 984—namely, the creation of a new fuel market by virtue of the presence of the casino—and that the Nation's interests in taxing this reservation-created value to raise revenue for reservation infrastructure outweighed the State's "general interest in raising revenues," *id.*, at 986. We granted certiorari, 543 U. S. 1186 (2005), and now reverse.

## II

Although we granted certiorari to determine whether Kansas may tax a non-Indian distributor's *off-reservation* receipt of fuel without being subject to the *Bracker* interest-balancing test, Pet. for Cert. i, the Nation maintains that Kansas' "tax is imposed not on the off-reservation receipt of fuel, but on its *on-reservation sale and delivery*," Brief for Respondent 11 (emphasis in original). As the Nation recognizes, under our Indian tax immunity cases, the "who" and the "where" of the challenged tax have significant consequences. We have determined that "[t]he initial and frequently dispositive question in Indian tax cases . . . is *who* bears the legal incidence of [the] tax," *Oklahoma Tax Comm'n* v. *Chickasaw Nation*, 515 U. S. 450, 458 (1995) (emphasis added), and that the States are categorically barred

from placing the legal incidence of an excise tax *"on a tribe or on tribal members* for sales made *inside Indian country"* without congressional authorization, *id.,* at 459 (emphasis added). We have further determined that, even when a State imposes the legal incidence of its tax on a non-Indian seller, the tax may nonetheless be pre-empted if the transaction giving rise to tax liability occurs on the reservation and the imposition of the tax fails to satisfy the *Bracker* interest-balancing test. See 448 U. S. 136 (holding that state taxes imposed on on-reservation logging and hauling operations by non-Indian contractor are invalid under the interest-balancing test); cf. *Central Machinery Co.* v. *Arizona Tax Comm'n,* 448 U. S. 160 (1980) (holding that the Indian trader statutes pre-empted Arizona's tax on a non-Indian seller's on-reservation sales).

The Nation maintains that it is entitled to prevail under the categorical bar articulated in *Chickasaw* because "[t]he fairest reading of the statute is that the legal incidence of the tax actually falls on the Tribe [on the reservation]." Brief for Respondent 17, n. 5. The Nation alternatively maintains it is entitled to prevail even if the legal incidence of the tax is on the non-Indian distributor because, according to the Nation, the tax arises out of a distributor's on-reservation transaction with the Tribe and is therefore subject to the *Bracker* balancing test. Brief for Respondent 15. We address the "who" and the "where" of Kansas' motor fuel tax in turn.

## A

Kansas law specifies that "the incidence of [the motor fuel] tax is imposed on the distributor of the first receipt of the motor fuel." Kan. Stat. Ann. § 79–3408(c) (2003 Cum. Supp.). We have suggested that such "dispositive language" from the state legislature is determinative of who bears the legal incidence of a state excise tax. *Chickasaw, supra,* at 461. But even if the state legislature had not employed such "dispositive language," thereby requiring us instead to look

to a "fair interpretation of the taxing statute as written and applied," *California Bd. of Equalization* v. *Chemehuevi Tribe*, 474 U. S. 9, 11 (1985) *(per curiam)*, we would nonetheless conclude that the legal incidence of the tax is on the distributor.

Kansas law makes clear that it is the distributor, rather than the retailer, that is liable to pay the motor fuel tax. Section 79–3410(a) (1997) provides, in relevant part, that "[e]very distributor . . . shall compute and shall pay to the director . . . the amount of [motor fuel] taxes due to the state." While the distributors are "entitled" to pass along the cost of the tax to downstream purchasers, see § 79–3409 (2003 Cum. Supp.), they are not required to do so. In sum, the legal incidence of the Kansas motor fuel tax is on the distributor. The lower courts reached the same conclusion. 379 F. 3d, at 982 ("The Kansas legislature structured the tax so that its legal incidence is placed on non-Indian distributors"); 241 F. Supp. 2d, at 1311 ("[I]t is undisputed that the legal incidence of the tax is directed off-reservation at the fuel distributors"); see also *Sac and Fox Nation of Missouri* v. *Pierce*, 213 F. 3d 566, 578 (CA10 2000) ("[T]he legal incidence of the [Kansas] tax law as presently written falls on the fuel distributors rather than on the Tribes"); *Winnebago Tribe of Nebraska* v. *Kline*, 297 F. Supp. 2d 1291, 1294 (Kan. 2004) ("Under the Kansas statutory scheme, the legal incidence of the state's fuel tax falls on the 'distributor of first receipt' of such fuel"); *Sac and Fox Nation of Missouri* v. *LaFaver*, 31 F. Supp. 2d 1298, 1307 (Kan. 1998) ("[T]he statutes are extremely clear in providing that the tax in question is imposed upon the distributor"). And the Kansas Department of Revenue, the state agency charged with administering the motor fuel tax, has concluded likewise. See Letter from David J. Heinemann, Office of Administrative Appeals, to Mark A. Burghart, Written Final Determination in Request for Informal Conference for Reconsideration of Agency Action, *Davies Oil Co., Inc.*, Docket No. 01–970 (Jan. 3, 2002)

(hereinafter Kansas Dept. of Revenue Letter) ("The legal incidence of the Kansas fuel tax rests with Davies, the distributor, who is up-stream from Nation, the retailer").

The United States, as *amicus*, contends that this conclusion is foreclosed by the Kansas Supreme Court's decision in *Kaul* v. *State Dept. of Revenue*, 266 Kan. 464, 970 P. 2d 60 (1998). The United States reads *Kaul* as holding that the legal incidence of Kansas' motor fuel tax rests on the Indian retailers, rather than on the non-Indian distributors. And, under the United States' view, so long as the Kansas Supreme Court's " 'definitive determination as to the operating incidence' " of its fuel tax is " 'consistent with the statute's reasonable interpretation,' " it should be " 'deemed conclusive.' " Brief for United States as *Amicus Curiae* 10 (quoting *Gurley* v. *Rhoden*, 421 U. S. 200, 208 (1975)).

We disagree with the United States' interpretation of *Kaul*. In *Kaul*, two members of the Citizen Band Potawatomi Tribe of Oklahoma sought to enjoin the enforcement of Kansas' fuel tax on fuel delivered to their gas station located on the Prairie Band Potawatomi Tribe of Kansas' Reservation. The Kansas Supreme Court determined that the station owners had standing to challenge the tax because the statute provided that the distributor was entitled to " 'charge and collect such tax . . . as a part of the selling price.' " *Kaul, supra*, at 474, 970 P. 2d, at 67 (quoting Kan. Stat. Ann. § 79–3409 (1995); emphasis deleted). The court determined that the station owners were not entitled to an injunction, however, because they were not members of a Kansas tribe and thus there had "been no showing by Retailers that payment of fuel tax to Kansas interferes with the self-government of a Kansas tribe or a Kansas tribal member." 266 Kan., at 477, 970 P. 2d, at 69. The court then noted that "the legal incidence of the tax on motor fuel rests on non-tribal members and does not affect the Potawatomi Indian reservation within the state of Kansas." *Ibid.*

*Kaul* does not foreclose our determination that the distributor bears the legal incidence of the Kansas motor fuel tax. As an initial matter, it is unclear whether the court's reference to "nontribal members" is a reference to the non-tribal-member retailers or the non-tribal-member distributors. At the very least, *Kaul*'s imprecise language cannot be characterized as a definitive determination. Moreover, the 1998 amendments to the Kansas fuel provisions, including the amendment to § 79–3408(c) that provides that "the incidence of this tax is imposed on the distributor," were not applied in *Kaul*. *Id.*, at 473, 970 P. 2d, at 66 (identifying provisions that were repealed in 1998 as being "in effect during the period relevant to this case"); *id.*, at 474, 970 P. 2d, at 67 (noting that a "critical statute" to its holding was the 1995 version of § 79–3409, which was amended in 1998). Accordingly, *Kaul* did not speak authoritatively on the provisions before us today.

## B

The Nation maintains that we must apply the *Bracker* interest-balancing test, irrespective of the identity of the taxpayer (*i. e.*, the party bearing the legal incidence), because the Kansas fuel tax arises as a result of the *on-reservation* sale and delivery of the motor fuel. See Brief for Respondent 15. Notably, however, the Nation presented a starkly different interpretation of the statute in the proceedings before the Court of Appeals, arguing that "[t]he balancing test is appropriate even though the legal incidence of the tax is imposed on the Nation's non-Indian distributor and is triggered by the distributor's receipt of fuel *outside the reservation*." Appellant's Reply Brief in No. 03–3218 (CA10), p. 3 (emphasis added); see also 241 F. Supp. 2d, at 1311 (District Court observing that "it is undisputed that the legal incidence of the tax is directed off-reservation at the fuel distributors"). A "fair interpretation of the taxing statute as written and applied," *Chemehuevi Tribe*, 474 U. S., at

11, confirms that the Nation's interpretation of the statute before the Court of Appeals was correct.

As written, the Kansas fuel tax provisions state that "the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel and such taxes shall be paid but once. Such tax shall be computed on all motor-vehicle fuels or special fuels received by each distributor, manufacturer or importer in this state and paid in the manner provided for herein . . . ." Kan. Stat. Ann. § 79–3408(c) (2003 Cum. Supp.). Under this provision, the distributor who initially receives the motor fuel is liable for payment of the fuel tax, and the distributor's tax liability is determined by calculating the amount of fuel received by the distributor.

Section 79–3410(a) (1997) confirms that it is the distributor's off-reservation receipt of the motor fuel, and not any subsequent event, that establishes tax liability. That section provides:

> "[E]very distributor, manufacturer, importer, exporter or retailer of motor-vehicle fuels or special fuels, on or before the 25th day of each month, shall render to the director . . . a report certified to be true and correct showing the number of gallons of motor-vehicle fuels or special fuels received by such distributor, manufacturer, importer, exporter or retailer during the preceding calendar month . . . . Every distributor, manufacturer or importer within the time herein fixed for the rendering of such reports, shall compute and shall pay to the director at the director's office the amount of taxes due to the state on all motor-vehicle fuels or special fuels received by such distributor, manufacturer or importer during the preceding calendar month."

Thus, Kansas law expressly provides that a distributor's monthly tax obligations are determined by the amount of fuel received by the distributor during the preceding month. See *Kline*, 297 F. Supp. 2d, at 1294 ("The distributor must

compute and remit the tax each month for the fuel received by the distributor in the State of Kansas").

The Nation disagrees. It contends that what is taxed is not the distributors' (off-reservation) receipt of the fuel, but rather the distributors' use, sale, or delivery of the motor fuel—in this case, the distributors' (on-reservation) sale or delivery to the Nation. The Nation grounds support for this proposition in § 79–3408(a) (2003 Cum. Supp.). That section provides that "[a] tax . . . is hereby imposed on the use, sale or delivery of all motor vehicle fuels or special fuels which are used, sold or delivered in this state for any purpose whatsoever." But this section cannot be read in isolation. If it were, it would permit Kansas to tax the same fuel multiple times—namely, every time fuel is sold, delivered, or used. Section 79–3408(a) must be read in conjunction with subsection (c), which specifies that "the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel *and such taxes shall be paid but once.*" (Emphasis added.) The identity of the single, taxable event is revealed in the very next sentence of subsection (c), which provides that "[s]uch tax shall be computed on all . . . fuels *received by each distributor.*" (Emphasis added.) In short, the "use, sale or delivery" that triggers tax liability is the sale or delivery of the fuel to the distributor. The Kansas Department of Revenue has issued a final determination reaching the same conclusion. See Kansas Dept. of Revenue Letter ("[P]ursuant to the Kansas Motor Fuel Tax Act . . . the state fuel tax was imposed on Davies, a distributor, *when Davies first received the fuel at its business, a site located off of Nation's reservation*" (emphasis added)).

The Nation claims further support for its interpretation of the statute in § 79–3408(d) (2003 Cum. Supp.). Section 79–3408(d) permits distributors to obtain deductions from the Kansas motor fuel tax for certain postreceipt transactions, such as sale or delivery of fuel for export from the State and sale or delivery of fuel to the United States.

§§ 79–3408(d)(1)–(2).  The Nation argues that these exemptions make it impossible for a distributor to calculate its "ultimate tax liability" without knowing "whether, where, and to whom the fuel is ultimately sold or delivered."  Brief for Respondent 15.  The Nation infers from these provisions that the taxable event is actually the distributors' postreceipt delivery of fuel to retailers such as the Nation, rather than the distributors' initial receipt of the fuel.

The Nation's theory suffers from a number of conceptual defects.  First, under Kansas law, a distributor must pay the tax even for fuel that sits in its inventory—fuel that is not (or at least has not yet been) used, sold, or delivered by the distributor.[3]  But the Nation's interpretation presumes that the tax is owed *only* on a distributor's postreceipt use, sale, or delivery of fuel.  As this interpretation cannot be reconciled with the manner in which the Kansas motor fuel tax is

---

[3] This understanding of the application of the Kansas fuel tax is confirmed by the form that fuel distributors are required to fill out each month pursuant to Kan. Stat. Ann. § 79–3410 (1997).  See Kansas Form MF–52, available at http://www.ksrevenue.org/pdf/forms/mf52.pdf (as visited Nov. 21, 2005, and available in Clerk of Court's case file).  The form instructs distributors to enter in line 1 "the total net gallons of gasoline, gasohol and special fuel received or imported" during the preceding month.  *Id.*, at 2.  The distributors may then "[e]nter the deductions that apply to your business" in lines 2(a)-to-(e) for the preceding month.  Those deductions include "[n]et gallons of fuel exported from Kansas," "[n]et gallons of fuel sold to the U. S. Government," "[n]et gallons of fuel sold for aviation purposes," and "[n]et gallons of dyed diesel fuel *received* for the month," the very deductions described in § 79–3408(d), *ibid.* (emphasis in original).  The distributor's tax liability is then calculated by subtracting the total deductions from the total fuel received, and applying the 2.5 percent handling allowance to the difference.  Thus, the event that generates a distributor's tax liability is its receipt of fuel.  And the distributor must pay tax on that fuel even if it is not subsequently delivered or sold.  While a distributor may decrease its tax liability by engaging in transactions that entitle it to deductions, such as by selling or delivering fuel to an exempt entity like the United States, its tax liability is unaffected by sales or deliveries to nonexempt entities like the Nation.

actually applied, it must be rejected.[4]   Second, the availability of tax deductions does not change the nature of the taxable event, here the distributor's receipt of the fuel.   By analogy, an individual federal income taxpayer may reduce his tax liability by paying home mortgage interest.   But that entitlement does not render the taxable event anything other than the receipt of income by the taxpayer.   See 26 U. S. C. § 1 (2000 ed. and Supp. II), § 163(h) (2000 ed.); cf. *North American Oil Consol.* v. *Burnet,* 286 U. S. 417, 424 (1932) (federal income tax liability arises when "a taxpayer . . . has received income").

Finally, the Nation contends that its interpretation of the statute is supported by Kan. Stat. Ann. § 79–3417 (1997), which permits a refund—in certain circumstances—for destroyed fuel.   However, the Nation's interpretation is actually foreclosed by that section.   Section 79–3417 entitles a distributor to a "refund from the state of the amount of motor-vehicle fuels or special fuels tax paid on any . . . fuels of 100 gallons or more in quantity, which are lost or destroyed at any one time while such distributor is the owner thereof," provided the distributor supplies the required notification and documentation to the State.   This section illustrates that a distributor pays taxes for fuel in its possession that it has not delivered or sold, and is only entitled to the refund described in this section for tax it has already paid

---

[4] Indeed, the dissent acknowledges that tax is owed on fuel a distributor receives and holds in inventory—and thus implicitly concedes that the distributors' off-reservation receipt of motor fuel is the event that gives rise to tax liability.   See *post,* at 120 (opinion of GINSBURG, J.).   While the dissent contends that such tax is ultimately "effectively offset" by a subsequent delivery of the inventoried fuel, *ibid.,* the dissent does not explain the meaning of this opaque contention.   A distributor's subsequent delivery of fuel to the Nation or any other fuel retailer in Kansas has *no effect* on tax that it has already paid in a preceding month.   Indeed, the distributor does not report delivery to retailers on its monthly tax return.   See Kansas Form MF–52.   And a distributor must pay the tax even if the fuel is *never* delivered.

on fuel that is subsequently destroyed. While this section does not specify the event that gives rise to the distributor's tax liability, it forecloses the Nation's contention that such liability does not arise until fuel is sold or delivered to a nonexempt entity.

## III

Although Kansas' fuel tax is imposed on non-Indian distributors based upon those distributors' off-reservation receipt of motor fuel, the Tenth Circuit concluded that the tax was nevertheless still subject to the interest-balancing test this Court set forth in *Bracker*, 448 U. S. 136. As *Bracker* itself explained, however, we formulated the balancing test to address the "difficult questio[n]" that arises when "a State asserts authority over the conduct of non-Indians engaging in activity *on the reservation.*" *Id.*, at 144–145 (emphasis added). The *Bracker* interest-balancing test has never been applied where, as here, the State asserts its taxing authority over non-Indians off the reservation. And although we have never addressed this precise issue, our Indian tax immunity cases counsel against such an application.

## A

We have applied the balancing test articulated in *Bracker* only where "the legal incidence of the tax fell on a nontribal entity engaged in a transaction with tribes or tribal members," *Arizona Dept. of Revenue v. Blaze Constr. Co.*, 526 U. S. 32, 37 (1999), on the reservation. See *Bracker, supra* (motor carrier license and use fuel taxes imposed on on-reservation logging and hauling operations by non-Indian contractor); *Department of Taxation and Finance of N. Y. v. Milhelm Attea & Bros.*, 512 U. S. 61 (1994) (various taxes imposed on non-Indian purchasers of goods retailed on-reservation); *Cotton Petroleum Corp. v. New Mexico*, 490 U. S. 163 (1989) (state severance tax imposed on non-Indian lessee's on-reservation production of oil and gas); *Ramah Navajo School Bd., Inc. v. Bureau of Revenue of N. M.*, 458

U. S. 832 (1982) (state gross receipts tax imposed on private contractor's proceeds from the construction of a school on the reservation); *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134 (1980) (cigarette and sales taxes imposed on on-reservation purchases by nonmembers); *Central Machinery Co.,* 448 U. S. 160 (tax imposed on on-reservation sale of farm machinery to Tribe). Similarly, the cases identified in *Bracker* as supportive of the balancing test were exclusively concerned with the on-reservation conduct of non-Indians. See *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965) (gross proceeds tax imposed on non-Indian retailer on Navajo Indian Reservation); *Thomas* v. *Gay,* 169 U. S. 264 (1898) (state property tax imposed on cattle owned by non-Indian lessees of tribal land); *Williams* v. *Lee,* 358 U. S. 217 (1959) (holding the state courts lacked jurisdiction over dispute between non-Indian, on-reservation retailer and Indian debtors).[5]

---

[5] Our recent discussion in *Oklahoma Tax Comm'n* v. *Chickasaw Nation,* 515 U. S. 450 (1995), regarding the application of the interest-balancing test to motor fuel taxes is not to the contrary. In *Chickasaw,* we noted in dicta that, "if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax; if the balance of federal, state, and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy, and may place on a tribe or tribal members 'minimal burdens' in collecting the toll." *Id.,* at 459 (citation omitted). *Chickasaw* did not purport to expand the applicability of *White Mountain Apache Tribe* v. *Bracker,* 448 U. S. 136 (1980), to an off-reservation tax on non-Indians. Indeed, the quoted sentence reveals that *Chickasaw* discussed the applicability of the interest-balancing test in the context of a tax that is collected by the tribe—a tax that necessarily arises from on-reservation conduct.

Moreover, in purporting to craft a "'bright-line standard'" in that case, we noted that Oklahoma "generally is free" to impose the legal incidence of its motor fuel tax on the consumer—who purchases fuel on the reservation—and then require the Indian retailers to "'collect and remit the levy.'" 515 U. S., at 460. If Oklahoma would have been free to impose the legal incidence of its fuel tax downstream from the Indian retailers, then Kansas should be equally free to impose the legal incidence of its fuel tax upstream from Indian retailers notwithstanding the applicability of

Limiting the interest-balancing test exclusively to *on-reservation* transactions between a nontribal entity and a tribe or tribal member is consistent with our unique Indian tax immunity jurisprudence. We have explained that this jurisprudence relies "heavily on the doctrine of tribal sovereignty . . . which historically gave state law 'no role to play' within a tribe's territorial boundaries." *Oklahoma Tax Comm'n* v. *Sac and Fox Nation,* 508 U. S. 114, 123–124 (1993) (quoting *McClanahan* v. *Arizona Tax Comm'n,* 411 U. S. 164, 168 (1973)). We have further explained that the doctrine of tribal sovereignty, which has a "significant geographical component," *Bracker, supra,* at 151, requires us to "revers[e]" the "'general rule'" that "'exemptions from tax laws should . . . be clearly expressed.'" *Sac and Fox, supra,* at 124 (quoting *McClanahan, supra,* at 176). And we have determined that the geographical component of tribal sovereignty "'provide[s] a backdrop against which the applicable treaties and federal statutes must be read.'" *Sac and Fox, supra,* at 124 (quoting *McClanahan, supra,* at 172). Indeed, the particularized inquiry we set forth in *Bracker* relied specifically on that backdrop. See 448 U. S., at 144–145 (noting that where "a State asserts authority over the conduct of non-Indians engaging in activity *on the reservation* . . . we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence" (emphasis added)).

We have taken an altogether different course, by contrast, when a State asserts its taxing authority outside of Indian country. Without applying the interest-balancing test, we

the interest-balancing test. Indeed, the *Chickasaw* dicta should apply *a fortiori* here; the upstream approach is *less* burdensome on the Tribe because it does not include the collecting and remitting requirements that typically, and permissibly, accompany a consumer tax.

have permitted the taxation of the gross receipts of an off-reservation, Indian-owned ski resort, *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145 (1973), and the taxation of income earned by Indians working on reservation but living off reservation, *Chickasaw,* 515 U. S. 450. In these cases, we have concluded that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache, supra,* at 148–149; *Chickasaw, supra,* at 465 (quoting *Mescalero Apache, supra,* at 148–149). If a State may apply a nondiscriminatory tax to Indians who have gone beyond the boundaries of the reservation, then it follows that it may apply a nondiscriminatory tax where, as here, the tax is imposed on non-Indians as a result of an off-reservation transaction. In these circumstances, the interest-balancing test set forth in *Bracker* is inapplicable. Cf. *Blaze Constr.,* 526 U. S., at 37 (declining to apply the *Bracker* interest-balancing test "where a State seeks to tax a transaction [on reservation] between the Federal Government and its non-Indian private contractor").

The application of the interest-balancing test to the Kansas motor fuel tax is not only inconsistent with the special geographic sovereignty concerns that gave rise to that test, but also with our efforts to establish "bright-line standard[s]" in the context of tax administration. 526 U. S., at 37 ("The need to avoid litigation and to ensure efficient tax administration counsels in favor of a bright-line standard for taxation of federal contracts, regardless of whether the contracted-for activity takes place on Indian reservations"); cf. *Chickasaw, supra,* at 460 (noting that the legal incidence test "'provide[s] a reasonably bright-line standard'"); *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation,* 502 U. S. 251, 267–268 (1992). Indeed, we have recognized that the *Bracker* interest-balancing test

"only cloud[s]" our efforts to establish such standards. *Blaze Constr., supra,* at 37. Under the Nation's view, however, any off-reservation tax imposed on the manufacture or sale of any good imported by the Nation or one of its members would be subject to interest balancing. Such an expansion of the application of the *Bracker* test is not supported by our cases.

Nor is the Nation entitled to interest balancing by virtue of its claim that the Kansas motor fuel tax interferes with its own motor fuel tax. As an initial matter, this is ultimately a complaint about the downstream economic consequences of the Kansas tax. As the owner of the station, the Nation will keep every dollar it collects above its operating costs. Given that the Nation sells gas at prevailing market rates, its decision to impose a tax should have no effect on its net revenues from the operation of the station; it should not matter whether those revenues are labeled "profits" or "tax proceeds." The Nation merely seeks to increase those revenues by purchasing untaxed fuel. But the Nation cannot invalidate the Kansas tax by complaining about a decrease in revenues. See *Colville,* 447 U. S., at 156 ("Washington does not infringe the right of reservation Indians to 'make their own laws and be ruled by them,' *Williams* v. *Lee,* 358 U. S. 217, 220 (1959), merely because the result of imposing its taxes will be to deprive the Tribes of revenues which they currently are receiving"). Nor would our analysis change if we accorded legal significance to the Nation's decision to label a portion of the station's revenues as tax proceeds. See *id.,* at 184, n. 9 (Rehnquist, J., concurring in part, concurring in result in part, and dissenting in part) ("When two sovereigns have legitimate authority to tax the same transaction, exercise of that authority by one sovereign does not oust the jurisdiction of the other. If it were otherwise, we would not be obligated to pay federal as well as state taxes on our income or gasoline purchases. Economic burdens on

the competing sovereign . . . do not alter the concurrent nature of the taxing authority").[6]

## B

Finally, the Nation contends that the Kansas motor fuel tax is invalid notwithstanding the inapplicability of the interest-balancing test, because it "exempts from taxation fuel sold or delivered to all other sovereigns," and is therefore impermissibly discriminatory. Brief for Respondent 17–20 (emphasis deleted); Kan. Stat. Ann. §§ 79–3408(d)(1)–(2) (2003 Cum. Supp.). But the Nation is not similarly situated to the sovereigns exempted from the Kansas fuel tax. While Kansas uses the proceeds from its fuel tax to pay for a significant portion of the costs of maintaining the roads and bridges on the Nation's reservation, including the main highway used by the Nation's casino patrons, Kansas offers no such services to the several States or the Federal Government. Moreover, to the extent Kansas fuel retailers bear the cost of the fuel tax, that burden falls equally upon all retailers within the State regardless of whether those retailers are located on an Indian reservation. Accordingly, the Kansas motor fuel tax is not impermissibly discriminatory.

\* \* \*

For the foregoing reasons, we hold that the Kansas motor fuel tax is a nondiscriminatory tax imposed on an off-reservation transaction between non-Indians. Accordingly, the tax is valid and poses no affront to the Nation's sovereignty. The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[6] These authorities also foreclose the Nation's contention that the Kansas motor fuel tax is invalid, irrespective of the applicability of *Bracker*, 448 U. S. 136, because it interferes with the Nation's right to self-government. See Brief for Respondent 45–47.

JUSTICE GINSBURG, with whom JUSTICE KENNEDY joins, dissenting.

The Kansas fuel tax at issue is imposed on distributors, passed on to retailers, and ultimately paid by gas station customers. Out-of-state sales are exempt, as are sales to other distributors, the United States, and U. S. Government contractors. Fuel lost or destroyed, and thus not sold, is also exempt. But no statutory exception attends sales to Indian tribes or their members. Kan. Stat. Ann. §§ 79–3408; 79–3409; 79–3417 (1997 and 2003 Cum. Supp.).

The Prairie Band Potawatomi Nation (hereinafter Nation) maintains a casino and related facilities on its reservation. On nearby tribal land, as an adjunct to its casino, the Nation built, owns, and operates a gas station known as the Nation Station. Some 73% of the Nation Station's customers are casino patrons or employees. *Prairie Band Potawatomi Nation* v. *Richards*, 379 F. 3d 979, 982 (CA10 2004). The Nation imposes its own tax on fuel sold at the Nation Station, pennies per gallon less than Kansas' tax. *Ibid.*[1]

Both the Nation and the State have authority to tax fuel sales at the Nation Station. See *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 137 (1982) (describing "[t]he power to tax [as] an essential attribute of Indian sovereignty[,] . . . a necessary instrument of self-government and territorial management," which "enables a tribal government to raise revenues for its essential services"). As a practical matter, however, the two tolls cannot coexist. 379 F. 3d, at 986. If the Nation imposes its tax on top of Kansas' tax, then unless the Nation operates the Nation Station at a substantial loss, scarcely anyone will fill up at its pumps. Effectively double-taxed, the Nation Station must operate as an unprofitable venture, or not at all. In these circum-

---

[1] The Federal Government also imposes a tax on the "removal, entry, or sale" of all motor fuel. 26 U. S. C. § 4081(a)(1). Neither the State nor the Nation contests the applicability of this tax to fuel destined for the Nation Station.

stances, which tax is paramount? Applying the interest-balancing approach described in *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136 (1980), the Court of Appeals for the Tenth Circuit held that "the Kansas tax, as applied here, is preempted because it is incompatible with and outweighed by the strong tribal and federal interests against the tax." 379 F. 3d, at 983. I agree and would affirm the Court of Appeals' judgment.

## I

Understanding *Bracker* is key to the inquiry here. *Bracker* addressed the question whether a State should be preempted from collecting otherwise lawful taxes from non-Indians in view of the burden consequently imposed upon a tribe or its members. In that case, Arizona sought to enforce its fuel-use and vehicle-license taxes against a non-Indian enterprise that contracted with the White Mountain Apache Tribe to harvest timber from reservation forests. 448 U. S., at 138–140. The Court recognized that Arizona's levies raised difficult questions concerning "the boundaries between state regulatory authority and tribal self-government." *Id.*, at 141. Determining whether taxes formally imposed on non-Indians are preempted, the Court instructed, should not turn "on mechanical or absolute conceptions of state or tribal sovereignty, but [calls] for a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *Id.*, at 145. This inquiry is "designed to determine whether, in the specific context, the exercise of state authority would violate federal law," *ibid.*, or "unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them,'" *id.*, at 142 (quoting *Williams* v. *Lee*, 358 U. S. 217, 220 (1959)). Applying the interest-balancing approach, the Court concluded that "the proposed exercise of state authority [was] impermissible" because "it [was] undisputed that the economic burden of the asserted taxes will ultimately fall on the Tribe,"

"the Federal Government has undertaken comprehensive regulation of the harvesting and sale of tribal timber," and the state officials were "unable to justify the taxes except in terms of a generalized interest in raising revenue." 448 U. S., at 151.

The Court has repeatedly applied the interest-balancing approach described in *Bracker* in evaluating claims that state taxes levied on non-Indians should be preempted because they undermine tribal and federal interests.[2] In many cases, both pre- and post-*Bracker*, a balancing analysis has yielded a decision upholding application of the state tax in question. See, *e. g., Cotton Petroleum Corp.* v. *New Mexico,* 490 U. S. 163, 183–187 (1989) (State permitted to impose a severance tax on a non-Indian company that leased tribal land for oil and gas production); *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134, 154–159 (1980) (State permitted to tax non-Indians' purchases of cigarettes from on-reservation tribal retailers); *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation,* 425 U. S. 463, 481–483 (1976) (same). Sometimes, however, particularized inquiry has resulted in a holding that federal or tribal interests are superior. See, *e. g., Ramah Navajo School Bd., Inc.* v. *Bureau of Revenue of N. M.,* 458 U. S. 832, 843–846 (1982) (State prohibited from imposing gross-receipts tax on a non-Indian contractor constructing an on-reservation tribal school).

Kansas contends that the interest-balancing approach is not suitably employed to assess its fuel tax for these reasons: (1) The Kansas Legislature imposed the legal incidence of

---

[2] The Court has also applied the interest-balancing approach to other forms of state regulation relating to Indian tribal societies. See, *e. g., California* v. *Cabazon Band of Mission Indians,* 480 U. S. 202, 216–217 (1987) (State prohibited from regulating non-Indian customers of tribal bingo operation); *New Mexico* v. *Mescalero Apache Tribe,* 462 U. S. 324, 333–343 (1983) *(Mescalero II)* (State barred from enforcing game laws against non-Indians for on-reservation hunting and fishing).

the tax on the distributor—here, a non-Indian enterprise—not on retailers or their customers; and (2) the distributor's liability is triggered when it receives fuel from its supplier—a transaction that occurs off reservation. Reply Brief 2–6. Given these circumstances, Kansas urges and the Court accepts, no balancing is in order. See *ante*, at 12–13; Brief for Petitioner 6, 14–21. It is irrelevant in the State's calculus that its approach would effectively nullify the tribal fuel tax.

I note first that Kansas' placement of the legal incidence of the fuel tax is not as clear and certain as the State suggests and the Court holds. True, the statute states that "the incidence of this tax is imposed on the distributor of the first receipt of the motor fuel." Kan. Stat. Ann. § 79–3408(c) (2003 Cum. Supp.). But the statute declares initially that the tax "is hereby imposed on the use, sale or delivery of all motor vehicle fuels . . . used, sold or delivered in this state for any purpose whatsoever," § 79–3408(a), and it authorizes distributors to pass on the tax to retailers, § 79–3409. Notably, the statute excludes from taxation several "transactions," including the "sale or delivery of motor-vehicle fuel . . . for export from the state of Kansas to any other state or territory or to any foreign country"; "sale or delivery . . . to the United States"; "sale or delivery . . . to a contractor for use in performing work for the United States"; and "sale or delivery . . . to another duly licensed distributor." § 79–3408(d). Kansas also excludes from taxation "lost or destroyed" fuel, which is never sold by the distributor. § 79–3417 (1997). These provisions indicate not only that the Kansas Legislature anticipated that distributors would shift the tax burden further downstream. They reveal as well where the Court's analysis of the fuel tax goes awry.

When all the exclusions are netted out, the Kansas tax is imposed not on all the distributor's receipts, but effectively *only* on fuel actually *resold* by the distributor to an in-state nonexempt purchaser. To illustrate: Suppose in January a distributor acquires 100,000 gallons of fuel and promptly sells

80,000 to in-state nonexempt purchasers and 20,000 to exempt purchasers, for example, the United States or a U. S. contractor. The distributor would compute its tax liability by "deducting" the 20,000 gallons, see *ante,* at 108, n. 3, but would *remit tax* only on the 80,000 gallons bought by in-state nonexempt retailers.[3]  If the distributor elected to build inventory in January by holding an additional 10,000 gallons for resale in February, Kansas would tax in January, but the distributor would effectively offset in February the tax paid in January on the inventory buildup.  Again, in the end, only fuel actually sold to in-state nonexempt buyers would be burdened by Kansas' fuel tax.[4]

Kansas' attribution of controlling effect to the formal legal incidence of the tax rests in part on the State's misreading of *Oklahoma Tax Comm'n* v. *Chickasaw Nation,* 515 U. S. 450 (1995).  See Brief for Petitioner 8, 16–20.  The Court in that case distinguished instances in which the legal incidence of a State's excise tax rests on a tribe or tribal members, from instances in which the legal incidence rests on non-Indians.  When "the legal incidence . . . rests on a tribe or on tribal members for sales made inside Indian country," the Court said, "the tax cannot be enforced absent clear congres-

---

[3] The Court analogizes the fuel excise tax "deduction" of exempt sales to the federal income tax deduction for home mortgage interest. *Ante,* at 109.  The analogy is misconceived.  An excise tax "deduction" bears no realistic resemblance to a personal income tax deduction provided by Congress for a nonbusiness personal expense.  An excise tax "deduction," however, may fairly be compared to the standard income tax treatment of merchandise returns.  In any period, goods returned and held for resale offset goods sold, so that only net sales yield gross profits for taxation purposes.  See 26 CFR § 1.446–1(a)(4)(i) (2005); cf. § 1.458–1(g) (adjustments under elective treatment of certain post-year-end returns of magazines, paperback books, and recordings).

[4] If in February, the 10,000 gallons were destroyed and thus not sold, Kansas would nonetheless offset the fuel tax burden as Kan. Stat. Ann. § 79–3417 (1997) provides, because these gallons would never be sold to in-state nonexempt buyers.

sional authorization." 515 U. S., at 459. This "bright-line standard," *id.*, at 460, is sensitive to the sovereign status of Indian tribes, and reflects the Court's recognition that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." *Colville*, 447 U. S., at 154.[5]

When a State places the legal incidence of its tax on non-Indians, however, no similarly overt disrespect for a tribe's independence and dignity is displayed. In cases of this genre, *Chickasaw Nation* recognized, the Court has resisted adoption of a categorical rule. In lieu of attributing dispositive significance to the legal incidence, the Court has focused on the particular levy, and has evaluated the federal, state, and tribal interests at stake. 515 U. S., at 459; see *Cotton Petroleum*, 490 U. S., at 176 (Instead of a "mechanical or absolute" test, the Court has "applied a flexible pre-emption analysis sensitive to the particular facts and legislation involved. Each case 'requires a particularized examination of the relevant state, federal, and tribal interests.'" (quoting *Ramah*, 458 U. S., at 838)).

*Chickasaw Nation* did observe that "if a State is unable to enforce a tax because the legal incidence of the impost is on Indians or Indian tribes, the State generally is free to amend its law to shift the tax's legal incidence." 515 U. S., at 460. Kansas took the cue. After our decision in *Chickasaw Nation*, Kansas amended its fuel tax statute to state that "the incidence of this tax is imposed on the distributor." Kan. Stat. Ann. § 79–3408(c) (2003 Cum. Supp.); see 1998 Kan. Sess. Laws, ch. 96, § 2, pp. 450–451; see also *Kaul*

---

[5] The standard also accords with our repeated admonition that a State may not "unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'" *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142 (1980) (quoting *Williams* v. *Lee*, 358 U. S. 217, 220 (1959)). Accord *Mescalero II*, 462 U. S., at 332–333; *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 171–172 (1973).

v. *State Dept. of Revenue*, 266 Kan. 464, 474, 970 P. 2d 60, 67 (1998).[6]

Kansas is mistaken, however, regarding the legal significance of this shift. *Chickasaw Nation* clarified only that a State could shift the legal incidence to non-Indians so as to avoid the categorical bar applicable when a state excise tax is imposed directly on a tribe or tribal members for on-reservation activity. 515 U. S., at 460. At the same time, *Chickasaw Nation* indicated that a shift in the legal incidence of the kind Kansas has legislated would trigger—not foreclose—interest balancing. *Ibid.*[7]

Kansas and the Court heavily rely upon *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145 (1973) *(Mescalero I)*. That case involved a ski resort operated by the Mescalero Apache Tribe on off-reservation land leased from the Federal Government. This Court upheld New Mexico's imposition of a tax on the gross receipts of the resort. Balancing was not in order, the Court explained, because the Tribe had ventured outside its own domain, and was fairly treated, for gross receipts purposes, just as a non-Indian enterprise would be. In such cases, the Court observed, an express-preemption standard is appropriately applied. As the Court put it: "Absent express federal law to the contrary, Indians going

---

[6] As earlier observed, *supra,* at 119, Kansas retained the opening declaration that the tax "is hereby imposed on the use, sale or delivery of all motor vehicle fuels . . . used, sold or delivered in this state for any purpose whatsover." Kan. Stat. Ann. § 79–3408(a) (2003 Cum. Supp.).

[7] The only "bright-line standard" *Chickasaw Nation* advanced is the categorical bar on tolls imposed directly on tribes or their members. 515 U. S., at 460. No doubt a tribal retailer may find an upstream state tax on its suppliers less burdensome than a downstream tax on its consumers. See *ante,* at 111, n. 5. But administrative ease is hardly the dispositive consideration. The Court has never limited interest balancing to state taxes imposed on the non-Indian consumers of tribal enterprises; it has also applied this approach to state regulation of the non-Indian suppliers of tribal enterprises. See, *e. g., Department of Taxation and Finance of N. Y.* v. *Milhelm Attea & Bros.*, 512 U. S. 61, 73–75 (1994).

beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Id.*, at 148–149. Accord *Chickasaw Nation*, 515 U. S., at 462–465 (State permitted to tax income of tribal members residing outside Indian country). Cases of the *Mescalero I* kind, however, do not touch and concern what is at issue in the instant case: taxes formally imposed on nonmembers that nonetheless burden *on-reservation* tribal activity.

Conceding that "we have never addressed th[e] precise issue" this case poses, the Court asserts that "our Indian tax immunity cases counsel against" application of the *Bracker* interest-balancing test to Kansas' fuel tax as it impacts on the Nation Station. *Ante*, at 110. The Court so maintains on the ground that the Kansas fuel tax is imposed on a non-Indian and is unrelated to activity "on the reservation." *Ante*, at 110–113. As earlier explained, see *supra*, at 121, one can demur to the assertion that the legal incidence of the tax falls on the distributor, a nontribal entity. With respect to sales and deliveries to the Nation Station, however, the nontribal entity can indeed be described as "engaged in [an on-reservation] transaction with [a tribe]." *Arizona Dept. of Revenue* v. *Blaze Constr. Co.*, 526 U. S. 32, 37 (1999).

The reservation destination of fuel purchased by the Nation Station does not show the requisite engagement, in the Court's view, but I do not comprehend why. The destination of the fuel counts not only under § 79–3408(a) (2003 Cum. Supp.) (fuel tax "is hereby imposed on . . . all motor vehicle fuels . . . used, sold or delivered in this state").[8] To whom and where the distributor sells are the criteria that determine the "transactions" on which "[n]o tax is . . . imposed," § 79–3408(d), and, correspondingly, the transactions on which

---

[8] Because § 79–3408(a) (2003 Cum. Supp.) does not aid the Court's theory that the State's tax operates entirely off reservation, the Court essentially reads the provision out of the statute, or treats it as harmless surplus. See *ante*, at 107.

the tax is imposed. As earlier explained, see *supra*, at 119–120, the tax is in reality imposed only on fuel actually resold by the distributor to an in-state nonexempt purchaser. Here, that purchaser is the Nation Station, plainly an on-reservation venture.[9]

Balancing tests have been criticized as rudderless, affording insufficient guidance to decisionmakers. See *Colville*, 447 U. S., at 176 (Rehnquist, J., concurring in part, concurring in result in part, and dissenting in part) (criticizing the "case-by-case litigation which has plagued this area of the law"); Brief for Petitioner 30–32. Pointed as the criticism may be, one must ask, as in life's choices generally, what is the alternative. "The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Colville*, 447 U. S., at 156. No "bright-line" test is capable of achieving such an accommodation with respect to state taxes formally

---

[9] At the Court of Appeals level, the Nation presented no "starkly different interpretation of the statute." *Ante*, at 105. This Court, in citing Appellant's Reply Brief in No. 03–3218 (CA10), p. 3, to the contrary, apparently failed to read on. At page 12, the Reply Brief states: "The fact that the state tax is technically imposed off-reservation on a non-Indian is not controlling. The state tax is directed at and burdens reservation value." Moreover, it is surely putting words in the Nation's mouth to assert that "[u]nder the Nation's view . . . any off-reservation tax imposed on the manufacture or sale of any good imported by the Nation or one of its members would be subject to interest balancing." *Ante*, at 114. The Nation itself expressly "does not contend . . . that a non-discriminatory, off-reservation state tax of general applicability may be precluded simply because the tax has an adverse economic impact on a Tribe or its members." Brief for Respondent 1. As the Nation points out and the Court of Appeals comprehended, "the actual issue presented here [is] the permissibility of a state tax that effectively *nullifies* a Tribe's power to impose a comparable tax on fuel sold at market price by a tribally owned, on-reservation gas station." *Ibid.* (emphasis in original); see *Prairie Band Potawatomi Nation* v. *Richards*, 379 F. 3d 979, 986 (CA10 2004).

imposed on non-Indians, but impacting on-reservation ventures. The one the Court adopts inevitably means, so long as the State officially places the burden on the non-Indian distributor in cases of this order, the Tribe loses. *Faute de mieux* and absent congressional instruction otherwise, I would adhere to precedent calling for "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *Bracker*, 448 U. S., at 145.

## II

I turn to the question whether the Court of Appeals correctly balanced the competing interests in this case. Kansas and the Nation both assert a substantial interest in using their respective fuel taxes to raise revenue for road maintenance. Weighing competing state and tribal interests in raising revenue for public works, *Colville* observed:

> "While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services." 447 U. S., at 156–157.

In *Colville*, it was "painfully apparent" that outsiders had no reason to travel to Indian reservations to buy cigarettes other than the bargain prices tribal smokeshops charged by virtue of their claimed exemption from state taxation. *Id.*, at 154–155. The Court upheld the State of Washington's taxes on cigarette purchases by nonmembers at tribal smokeshops. No "principl[e] of federal Indian law," the Court said, "authorize[s] Indian tribes . . . to market an exemption from state taxation to persons who would normally do their business elewhere." *Id.*, at 155.

This case, as the Court of Appeals recognized, bears scant resemblance to *Colville*. "[I]n stark contrast to the smoke-shops in *Colville*," the Nation here is not using its asserted exemption from state taxation to lure non-Indians onto its reservation. 379 F. 3d, at 985. The Nation Station is not visible from the state highway, and it advertises no exemption from the State's fuel tax. Including the Nation's tax, the Nation Station sells fuel "'within 2¢ per gallon of the price prevailing in the local market.'" *Id.*, at 982 (quoting the Nation's expert's report); see also App. 36–40.[10] The Nation Station's draw, therefore, is neither price nor proximity to the highway; rather, the Nation Station operates almost exclusively as an amenity for people driving to and from the casino.

The Tenth Circuit regarded as valuable to its assessment the opinion of the Nation's expert, which concluded: "'[T]he Tribal and State taxes are mutually exclusive and only one can be collected without reducing the [Nation Station's] fuel business to virtually zero.'" 379 F. 3d, at 986. Kansas "submitted [no] contradictory evidence" and did not argue that the expert opinion offered by the Nation was "either incorrect or exaggerated." *Ibid.*[11] In this respect, the case

[10] Tribes, it should be plain, cannot prevail in the interest-balancing analysis simply because they tax the same product or activity that the State seeks to tax. See *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, 156 (1980). Otherwise, "the Tribes could impose a nominal tax and open chains of discount stores at reservation borders, selling goods of all descriptions at deep discounts and drawing custom from surrounding areas." *Id.*, at 155; see *infra*, at 130.

[11] At oral argument, it was suggested that the Nation Station might pass on both taxes to its customers if it were willing to forgo some of its profits. Tr. of Oral Arg. 3–6, 25–27, 48–50. This speculation apparently did not take account of the opinion and explanation of the Nation's expert, which stands uncontradicted in the record developed in the lower courts. Moreover, the Nation's counsel informed the Court: "[T]he [T]ribe is being forced right now to subsidize the sales at the [Nation S]tation at a loss, which it's doing for the balance of this litigation." *Id.*, at 25; cf. *ante*, at 114–115.

is indeed novel. It is the first case in which a Tribe demonstrated below that the imposition of a state tax would prevent the Tribe from imposing its own tax. Cf. *Cotton Petroleum,* 490 U. S., at 185 (state and tribal taxes were not mutually exclusive because "the Tribe could, in fact, increase its taxes without adversely affecting on-reservation oil and gas development").

The Court of Appeals considered instructive this Court's decision in *California* v. *Cabazon Band of Mission Indians,* 480 U. S. 202 (1987). See 379 F. 3d, at 985. The Court there held that tribal and federal interests outweighed state interests in regulating tribe-operated facilities for bingo and other games. *Cabazon,* 480 U. S., at 219–220. Distinguishing *Colville,* the Court pointed out that the Tribes in *Cabazon* "[were] not merely importing a product onto the reservatio[n] for immediate resale to non-Indians"; they had "built modern facilities" and provided "ancillary services" so that customers would come in increasing numbers and "spend extended periods of time" playing their "well-run games." 480 U. S., at 219; see also *New Mexico* v. *Mescalero Apache Tribe,* 462 U. S. 324, 327, 341 (1983) *(Mescalero II)* (State barred from regulating hunting and fishing on-reservation where the Tribe had constructed a "resort complex" and developed wildlife and land resources).

As in *Cabazon,* so here, the Nation Station is not "merely importing a product onto the reservatio[n] for immediate resale to non-Indians" at a stand-alone retail outlet. 480 U. S., at 219. Fuel sales at the Nation Station are "an integral and essential part of the [Tribe's] on-reservation gaming enterprise." 379 F. 3d, at 984. The Nation built the Nation Station as a convenience for its casino patrons and, but for the casino, there would be no market for fuel in this otherwise remote area. *Id.,* at 982.

The Court of Appeals further emphasized that the Nation's "interests here are strengthened because of its need to raise fuel revenues to construct and maintain reservation

roads, bridges, and related infrastructure without state assistance." *Id.*, at 985. The Nation's fuel revenue comes exclusively from the Nation Station, and that revenue (approximately $300,000 annually) may be used only for " 'constructing and maintaining roads, bridges and rights-of-way located on or near the reservation.' " *Id.*, at 985–986 (quoting Prairie Band Potawatomi Law and Order Code § 10–6–7 (2003)).

The Nation's interests coincide with "strong federal interests in promoting tribal economic development, tribal self-sufficiency, and strong tribal governments." 379 F. 3d, at 986. The United States points to the poor condition of Indian reservation roads, documented in federal reports, conditions that affect not only driving safety, but also the ability to furnish emergency medical, fire, and police services on an expedited basis, transportation to schools and jobs, and the advancement of economic activity critical to tribal self-sufficiency. Brief for United States as *Amicus Curiae* 26; see, *e. g.*, Dept. of Interior, Bureau of Indian Affairs, TEA–21 Reauthorization Resource Paper: Transportation Serving Native American Lands (May 2003). The shared interest of the Federal Government and the Nation in improving reservation roads is reflected in Department of the Interior regulations implementing the Indian Reservation Roads Program. See 69 Fed. Reg. 43090 (2004); 25 CFR § 170 *et seq.* (2005). The regulations aim at enhancing the ability of tribal governments to promote road construction and maintenance. They anticipate that tribes will supplement federal funds with their own revenues, including funds gained from a "[t]ribal fuel tax." § 170.932(d). Because the Nation's roads are integrally related to its casino enterprise, they also further federal interests in tribal economic development advanced by the Indian Gaming Regulatory Act, 102 Stat. 2467, 25 U. S. C. § 2701 *et seq.*

Against these strong tribal and federal interests, Kansas asserts only its "general interest in raising revenues." 379

F. 3d, at 986. "Kansas' interest," as the Court of Appeals observed, "is not at its strongest." *Id.*, at 987. By effectively taxing the Nation Station, Kansas would be deriving revenue "primarily from value generated on the reservation" by the Nation's casino. *Ibid.* Moreover, the revenue Kansas would gain from applying its tax to fuel destined for the Nation Station appears insubstantial when compared with the total revenue ($6.1 billion in 2004) the State annually collects through the tax. See *id.*, at 982; Brief for Respondent 12 (observing that "[t]he tax revenues at issue—roughly $300,000 annually—are less than one-tenth of one percent of the total state fuel tax revenues").

The Court asserts that "Kansas uses the proceeds from its fuel tax to pay for a significant portion of the costs of maintaining the roads and bridges on the Nation's reservation." *Ante,* at 115. The record reveals a different reality. According to the affidavit of the Director of the Nation's Road and Bridge Department, Kansas and its subdivisions have failed to provide proper maintenance even on their own roads running through the reservation. App. 79. As a result, the Nation has had to assume responsibility for a steadily growing number of road miles within the reservation (roughly 118 of the 212 total miles in 2000). *Ibid.;* see also Brief for Respondent 3, 40, 44–45. Of greater significance, Kansas expends *none* of its fuel tax revenue on the upkeep or improvement of tribally owned reservation roads. 379 F. 3d, at 986–987; cf. *Ramah,* 458 U. S., at 843, n. 7 ("This case would be different if the State were actively seeking tax revenues for the purpose of constructing, or assisting in the effort to provide, adequate [tribal services]."). In contrast, Kansas sets aside a significant percentage of its fuel tax revenues (over 40% in 1999) for counties and localities. Kan. Stat. Ann. § 79–3425 (2003 Cum. Supp.); see also § 79–34,142 (1997) (prescribing allocation formula); 1999 Kan. Sess. Laws, ch. 137, § 37, p. 1124. And, as indicated earlier, *supra,* at 118–120, Kansas accords the Nation no dispensation based

on the Nation's sovereign status. The Nation thus receives neither a state exemption so that it can impose its own fuel tax, nor a share of the State's fuel tax revenues. Accordingly, the net result of invalidating Kansas' tax as applied to fuel distributed to the Nation Station would be a somewhat more equitable distribution of road maintenance revenues in Kansas.

Kansas argues that, were the Nation to prevail in this case, nothing would stop the Nation from reducing its tax in order to sell gas below the market price. Brief for Petitioner 30. *Colville* should quell the State's fears in this regard. Were the Nation to pursue such a course, it would be marketing an exemption, much as the smokeshops did in *Colville*, and hence, interest balancing would likely yield a judgment for the State. See 447 U. S., at 155–157. In any event, as the Nation points out, the State could guard against the risk that "Tribes will impose a 'nominal tax' and sell goods at a deep discount on the reservation." Brief for Respondent 34–35. The State could provide a credit for any tribal tax imposed or enact a state tax that applies only to the extent that the Nation fails to impose an equivalent tribal tax. *Id.*, at 35.

Today's decision is particularly troubling because of the cloud it casts over the most beneficial means to resolve conflicts of this order. In *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U. S. 505 (1991), the Court counseled that States and tribes may enter into agreements establishing "a mutually satisfactory regime for the collection of this sort of tax." *Id.*, at 514; see also *Nevada v. Hicks*, 533 U. S. 353, 393 (2001) (O'CONNOR, J., concurring in part and concurring in judgment) (describing various state-tribal agreements); Brief for United States as *Amicus Curiae* 28–29, and n. 12; Brief for National Intertribal Tax Alliance et al. as *Amici Curiae;* Ansson, State Taxation of Non-Indians Who Do Business With Indian Tribes: Why Several Recent Ninth Circuit Holdings Reemphasize the Need

for Indian Tribes to Enter Into Taxation Compacts With Their Respective States, 78 Ore. L. Rev. 501, 546 (1999) ("More than 200 Tribes in eighteen states have resolved their taxation disputes by entering into intergovernmental agreements.").[12] By truncating the balancing-of-interests approach, the Court has diminished prospects for cooperative efforts to achieve resolution of taxation issues through constructive intergovernmental agreements.

In sum, the Nation operates the Nation Station in order to provide a service for patrons at its casino without, in any way, seeking to attract bargain hunters on the lookout for cheap gas. Kansas' collection of its tax on fuel destined for the Nation Station will effectively nullify the Nation's tax, which funds critical reservation road-building programs, endeavors not aided by state funds. I resist that unbalanced judgment.

\*　　\*　　\*

For the reasons stated, I would affirm the judgment of the Court of Appeals for the Tenth Circuit.

---

[12] In 1992, Kansas and the Nation negotiated an intergovernmental tax compact. App. 20–26. When the initial five-year term expired, the State declined to renew the agreement. Brief for United States as *Amicus Curiae* 3–4.