## AGUA CALIENTE BAND OF CAHUILLA INDIANS

v.

## RIVERSIDE COUNTY, et al.

Case No. ED CV 14-0007 DMG (DTBx)

United States District Court,
C.D. California.

Signed February 8, 2016

David J. Masutani, AlvaradoSmith APC, Los Angeles, CA, Catherine F. Munson, Kilpatrick Townsend and Stockton LLP, Washington, DC, Mark H. Reeves, Kilpatrick Townsend and Stockton LLP, Augusta, GA, Rob Roy E. Smith, Kilpatrick Townsend and Stockton LLP, Seattle, WA, for Agua Caliente Band of Cahuilla Indians.

Ronak N. Patel, Riverside, CA, Benjamin S. Sharp, Jennifer A. Maclean, Mark Harrison Foster, Jr., Perkins Coie LLP, Washington, DC, Meredith R. Weinberg, Perkins Coie LLP, Seattle, WA, Roderick E. Walston, Best Best and Krieger LLP, Walnut Creek, CA, for Riverside County, et al.

Proceedings: **IN CHAMBERS—ORDER RE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** [42]

Present: The Honorable DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

## I.

### BACKGROUND

On January 2, 2014, the Agua Caliente Band of Cahuilla Indians ("the Tribe") filed a Complaint ("Compl.") against Defendants Riverside County, Larry W. Ward, Paul Angulo, and Don Kent alleging unlawful taxation by Riverside County on lessees using and occupying Indian Trust land within the Tribe's Reservation. [Doc. # 1.] The Tribe seeks (1) a declaration that the assessment and collection of taxes on lessees' possessory interest in lands and permanent improvements on lands held in trust by the United States for the benefit of the Tribe and its members are unlawful and (2) an injunction against Riverside County's future assessment or collection of these taxes. (*Id.* ¶ 4.)

On February 18, 2014, the Desert Water Agency ("DWA") moved to intervene as a defendant in the Tribe's suit. [Doc. # 17.] On April 21, 2014, the Court granted DWA's motion to intervene permissively. [Doc. # 34.]

On July 28, 2014, Defendants filed a Motion for Judgment on the Pleadings ("MJP") as to the Tribe's action against the County, but not as to any claims against DWA. [Doc. # 42.] On June 25, 2014, the Tribe filed an opposition to the MJP ("MJP Opp."). [Doc. # 43.] On June 27, 2014, Defendants filed a response in support of the MJP ("MJP Reply"). [Doc. # 45.]

On August 27, 2014, the Court ordered supplemental briefing from both parties on arguments raised for the first time in Defendants' Reply, namely that 25 C.F.R. § 162.017(c) is invalid because it exceeds the authority of the Bureau of Indian Affairs, and that 25 C.F.R. § 162.017(c) does not preempt the County's possessory interest taxes because the regulation states that it is "subject to applicable federal law." [Doc. # 46.]

On September 17, 2014, Defendants filed a supplement to the MJP ("Supp MJP").

[Doc. # 49.] On October 8, the Tribe filed a supplemental opposition to the MJP ("Supp. Opp."). [Doc. # 50.] On October 15, 2014, the DWA filed a supplemental reply in support of the MJP ("Supp. Reply."). [Doc. # 56.]

On October 15, 2014, the National Intertribal Tax Alliance ("NITA") filed an *amicus curiae* brief with the permission of the court. [Doc. # 55.] On November 25, 2014, Barbara Etherington, Roger Etherington, Judith Fabris, and Heidi L. Herpel filed an *amicus curiae* brief with the permission of the court. [Doc. # 77.]

On June 29, 2015, the Court granted the Tribe's motion for partial voluntary dismissal of its claims as to the DWA's *ad valorem* tax, groundwater replenishment fee, and water service charge. [Doc. # 107.]

On August 27, 2015, the Tribe filed a notice of supplemental authority. [Doc. # 110.] On August 28, 2015, DWA filed a response to the notice of supplemental authority. [Doc. # 111.] On August 31, 2015, the Country of Riverside filed a response to the notice of supplemental authority. [Doc. # 112.]

Having duly considered the parties' written submissions, the Court **DENIES** Defendants' motion for judgment on the pleadings.

## II.

## FACTUAL BACKGROUND[1]

### A. The Parties

The Tribe is a federal recognized sovereign Indian tribe operating under a Constitution and by-laws approved by the Commissioner of Indian Affairs on April 18, 1957 (as amended). (Compl. ¶ 5.) The Tribe is composed of Cahuilla Indians who have lived in the Coachella Valley "since time immemorial." (*Id.* ¶ 10.) The Tribe brings this action on its own behalf and as *parens patriae* on behalf of its members, a substantial number of whom are lessors of trust land within the Tribe's reservation. (*Id.* ¶ 5.)

Riverside County is a municipal governmental entity. (*Id.* ¶ 6.) Larry W. Ward is sued in his official capacity as the Riverside County Assessor, Paul Angulo is sued in his official capacity as the Riverside County Auditor-Controller, and Don Kent is sued in his official capacity as the Riverside County Treasurer-Tax Collector. (*Id.* ¶¶ 7-9.)

### B. The Reservation and Trust Lands

The lands at issue are part of the Tribe's Reservation, which was established on May 15, 1876 by an executive order of President Ulysses S. Grant from lands in the Coachella Valley. (*Id.* ¶ 11.) The Reservation was expanded by an executive order of President Rutherford B. Hayes on September 29, 1877, and currently covers more than 31,396 acres of land within the exterior geographic boundaries of Riverside County, all of which is within the Tribe's aboriginal territory. (*Id.*) As a sovereign Indian nation, the Tribe has legal jurisdiction over its Reservation lands, and has enacted a number of statutes and ordinances regulating the use and possession of those lands, including a comprehensive land use ordinance, building and safety code, environmental laws, and tribal tax code. (*Id.* ¶ 12.)

Much of the land comprising the Reservation is held in trust by the United States for the benefit of the Tribe and its mem-

---

1. The Court takes the facts alleged in the complaint as true and construes them in the light most favorable to the non-moving party solely for the purpose of deciding this motion. *Fleming v. Pickard,* 581 F.3d 922, 925 (9th Cir.2009).

bers ("trust lands"). (*Id.* ¶ 13.) The trust lands are subject to numerous federal statutes and regulations that govern their use and disposition, including standards and requirements for surface leasing of the trust lands. (*Id.* ¶ 14.)

Subject to the approval of the United States Secretary of the Interior and various applicable federal statutes and regulations, the Tribe and its members lease certain parcels of Reservation trust land for commercial development and other purposes. (*Id.* at ¶ 15.) There are approximately 20,000 master leases, mini-master leases, subleases, and sub-subleases for use and occupancy of Reservation trust land. (*Id.* ¶ 16.) These leases are subject to an array of federal statutes governing the lease of Indian trust land, such as 25 U.S.C. § 415 (permitting Indian lands to be leased by Indian owners with the approval of the Secretary of the Interior), and regulations, such as 25 C.F.R. § 162 *et seq.* (promoting and regulating leasing on Indian land for housing, economic development, and other purposes). (*Id.*) Many of the leased parcels of the trust lands include permanent improvements, which are either owned outright by the Indian lessor or owned by the lessee for the term of the lease with a reversionary ownership interest in the Indian lessor that vests upon expiration or termination of the least. (*Id.* ¶ 17.)

Both the Tribe and Tribal member lessors derive critical income from these surface leasing interests. (*Id.* ¶ 18.) The income generated from the leasing of Reservation trust lands and associated improvements plays a critical role in funding the Tribe's government, its ability to provide governmental services to tribal members, and the ability of the Tribe and its members to be economically self-sufficient. (*Id.*)

## C. The Possessory Interest Tax

Defendants currently assess, levy, and collect a possessory interest tax ("PIT") on the lessees of the Reservation trust lands and permanent improvements thereon. (*Id.* ¶ 19.) A taxable possessory interest exists where a person or entity leases, rents, or uses real property owned by a government agency for its exclusive use. (*Id.*)[2] The PIT is assessed against the person or entity in possession of the property. (*Id.* ¶ 20.) The county assessors use the income, comparative sales, or cost approach to determine the value of the possessory interest. (*Id.* ¶ 23.) As applied on the Tribe's reservation, the PIT is therefore based on the value of the trust lands and permanent improvements erected on the trust lands. (*Id.*)

The PIT is a general revenue-generation tax that has no direct bearing on or nexus with services provided by Riverside County to the Tribe or its members. (*Id.* at ¶ 24.) The majority of Riverside County's PIT revenues are spent or otherwise disbursed outside of the Tribe's Reservation. (*Id.*) Defendants spend a substantial percentage of PIT revenues collected from the

---

**2.** *See* Cal. Code Regs. tit. 18, § 20(a) (" 'Possessory interests' are interests in real property that exist as a result of . . . possession of real property . . . [or a] right to possession of real property, or a claim to a right to the possession of real property, that is independent, durable, and exclusive of rights held by others in the real property, and that provides a private benefit to the possessor, except when coupled with ownership of a fee simple or life estate in the real property in the same person); 20(b) (" 'Taxable possessory interests' are possessory interests in publicly-owned real property. Excluded from the meaning of 'taxable possessory interests', however, are any possessory interests in real property located within an area to which the United States has exclusive jurisdiction concerning taxation. Such areas are commonly referred to as federal enclaves.")

Tribe's Reservation outside the Coachella Valley. (*Id.*)

The levying of the PIT against lessees of the trust lands lowers the lands' lease value, and the economic burden of the PIT falls at least in part on the Tribe and its members. (*Id.* ¶ 21.) Collection of the PIT also limits the Tribe's tax revenue. (*Id.* ¶ 22.) In order to avoid double taxation of lessees, the Tribe has voluntarily agreed to hold its lawful tribal tax in abeyance until Defendants cease the assessment and collection of the PIT. (*Id.*)

### D. 25 C.F.R. § 162.017(c)

On January 4, 2013, a new federal regulatory scheme governing the taxation of Reservation trust lands went into effect. (*Id.* ¶ 25.) The regulations state, *inter alia*, that:

> Subject only to applicable Federal law, the leasehold or possessory interest is not subject to any fee, tax, assessment, levy, or other charge imposed by any State or political subdivision of a State. Leasehold or possessory interests may be subject to taxation by the Indian tribe with jurisdiction.

25 C.F.R. § 162.017(c).[3] The Bureau of Indian Affairs ("BIA") Federal Register notice describing the new regulations states that the federal statutes and regulations governing leasing on Indians lands "occupy and preempt the field of Indian leasing," and that the federal statutory scheme is "comprehensive" and "pervasive," such that it "precludes State taxation." 77 Fed. Reg. 72440-01 (Dec. 5, 2012).

On January 15, 2013, the Tribe wrote to the Riverside County Board of Supervisors to notify it of the newly effective federal regulation and to propose a meeting between Tribal Council members and staff and Riverside County officials to discuss the new regulation. (Compl. ¶ 27.) Riverside County officials declined to meet with the Tribe and indicated that they would continue to assess and collect the PIT unless and until a court ordered them to stop doing so. (*Id.* ¶ 28.)

### III.

### LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is properly granted only when, taking all the factual allegations in the complaint as true, "the moving party is entitled to judgment as a matter of law." *Fairbanks N. Star Borough v. U.S. Army Corps. of Eng'rs*, 543 F.3d 586, 591 (9th Cir.2008) (quoting *Dunlap v. Credit Protection Ass'n, L.P.*, 419 F.3d 1011, 1012 n. 1 (9th Cir.2005) (*per curiam*)). A court must construe the factual allegations in the pleadings in the light most favorable to the non-moving party, but it need not accept as true conclusory allegations that are contradicted by matters properly subject to judicial notice or by exhibits incorporated into the complaint by reference. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citing *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir.2004)). "Generally, district courts have been unwilling to grant a Rule 12(c) dismissal unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Doleman v. Meiji Mut. Life Ins. Co.*, 727

---

**3.** Subsections (a) and (b) of the regulation impose the same prohibition against taxes applicable to "permanent improvements on the leased lands, without regard to ownership of those improvements," and "activities under a lease conducted on the leased premises." 25 C.F.R. §§ 162.017(a)-(b).

F.2d 1480, 1482 (9th Cir.1984) (internal citation and quotation marks omitted).

## IV.

## DISCUSSION

### A. The *Bracker* Balancing Test

In the landmark 1980 case, *White Mountain Apache Tribe v. Bracker*, the Supreme Court held that a motor carrier license and use fuel tax on a logging company doing business exclusively on an Indian reservation was preempted by federal law. 448 U.S. 136, 139, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980). The *Bracker* decision established a test for assessing the validity of state laws taxing the conduct of non-Indians on reservation land:

[Where] a State asserts authority over the conduct of non-Indians engaging in activity on the reservation, we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

*Id.* at 144–45, 100 S.Ct. 2578, 2584.

In balancing the competing interests at stake, the *Bracker* court reasoned that where (1) "the Federal Government has undertaken comprehensive regulation"; (2) "a number of the policies underlying the federal regulatory scheme are threatened by the taxes"; and (3) "respondents are unable to justify the taxes except in terms of a generalized interest in raising reve-

nue," the imposition of the tax is impermissible. 448 U.S. at 151, 100 S.Ct. 2578.

■■■ This balancing test applies "only where the legal incidence of the tax [falls] on a nontribal entity engaged in a transaction with tribes or tribal members on the reservation." *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 110, 126 S.Ct. 676, 686, 163 L.Ed.2d 429 (2005) (internal citation and quotation marks omitted). In such cases, "[s]tate jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983).

The Court will examine the evolution of Supreme Court and Ninth Circuit case law, relevant federal regulations and statutes, and the specific burdens and interests at stake in order to determine the proper application of the *Bracker* balancing test to the imposition of the County's PIT.

### B. *Agua Caliente* and *Fort Mojave*

Defendants contend that *Agua Caliente Band of Mission Indians v. Riverside Cnty.*, 442 F.2d 1184 (9th Cir.1971), and *Fort Mojave Tribe v. San Bernardino Cnty.*, 543 F.2d 1253 (9th Cir.1976), are binding on this Court, notwithstanding the subsequent Supreme Court decision in *Bracker* or the promulgation of new regulations at 25 C.F.R. § 162.017. (MJP Reply at 2–4, 8–11; Supp. MJP at 2–3.)

#### 1. *Agua Caliente*

In the 1971 case, *Agua Caliente*, the Ninth Circuit found that a PIT on non-Indian lessees of reservation land was not preempted by federal law. 442 F.2d at 1187. The court ruled that "absent a con-

gressional action forbidding the tax, then it is clear that the tax here imposed is valid." *Id.* at 1186. The court found that there were only two areas of statutory law mentioning taxation of the lands at issue, namely Public Law 86-339, which regulates equalization allotments on the Agua Caliente Reservation, and Public Law 280, 28 U.S.C. § 1360(b), which prohibits the "alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe." *Id.* at 1186–87. The court also examined the Federal Instrumentality doctrine, which prohibits taxation of federal government instrumentalities (including Indian property) which will "substantially impede or burden the functioning of the Federal Government." *Id.* at 1185.

The court found that there was "no statute which expressly forbids the imposition of a state use tax." *Id.* at 1186. Relying on *United States v. City of Detroit,* 355 U.S. 466, 470, 78 S.Ct. 474, 476, 2 L.Ed.2d 424 (1958), the court reasoned that "[if] a tax upon the use of property is not a tax upon the property itself, then there is nothing in these statutes which expressly forbids the tax here imposed." 442 F.2d at 1187.

The court examined a "substantial amount of evidence" regarding the economic effects of the tax upon Indian lessors, "conclud[ing] from it what [the court] would conclude without it, that ... the tax has an adverse economic effect upon [the Indian lessor]." *Id.* at 1186. Nonetheless, the court found that because "the California tax on possessory interests does not purport to tax the land as such, but rather taxes the 'full cash value' of the lessee's interest in it" the Indian lessor's title to the land was not "encumbered" by the PIT. *Id.* The court found the lack of clear congressional intent to be controlling, concluding that "the tax here is properly im-

posed unless it can be said that the legislation dealing with Indians and Indian lands demonstrates a congressional purpose to forbid the imposition of it." *Id.* The court noted that "[t]he general rule that tax exemptions are not granted by implication is applicable to taxing acts affecting Indians as it is to all others." *Id.* at 1187.

*Agua Caliente* was decided over a dissent urging that the tax be barred, given "the overwhelming evidence that the tax in question amounts, in its effect, to taxation of the full value of Indian trust lands." 442 F.2d at 1188 (9th Cir.1971) (Ely, J., dissenting). The dissent foreshadowed the *Bracker* balancing of federal, state, and tribal interests, contending that, "[if] an important federal policy conflicts with the goal of effective implementation of the state taxing power ... the Supremacy Clause demands that the extent to which a state tax burdens the federal policy be an important factor in determining the validity of the tax." *Id.* The dissent noted that no such balancing was undertaken by the majority opinion.

### 2. *Fort Mojave*

In the 1976 case, *Fort Mojave,* the Ninth Circuit upheld a similar PIT on non-Indian lessees on Indian land. 543 F.2d at 1257. The court examined Public Law 280 (one of the two laws examined by the *Agua Caliente* court) and section 476 of the Indian Reorganization Act ("IRA") for preemption purposes. *Id.* at 1256–57. Section 476 provides that a tribe has the right "to prevent the sale, disposition, lease or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe." 25 U.S.C. § 476(c)(2)(e). As discussed above, Public Law 280 prohibits the encumbrance or taxation of property owned by any Indian or any Indian tribe. P.L.-280, 28 U.S.C. § 1360(b). The court found that "neither

the Act nor PL-280 evidences a Congressional intent to preclude the taxation that is being challenged here." 543 F.2d at 1257.

*Fort Mojave* found that "the imposition of a possessory interest tax on the leasehold interest will have an economic effect on the Indian lessors" but "the legal incidence of the tax clearly falls on the lessee." *Id.* at 1256. The court held that "[w]hatever may be the scope of the indirect burden placed on the lessor's interest in this case, we hold that it is not sufficient to constitute an encumbrance of an 'interest in land or other tribal asset.'" *Id.* In other words, the burden on the Indian lessors did not constitute a clear violation of the statutory prohibitions on taxation or encumbrance of tribal lands or interests in lands without tribal permission.

The *Fort Mojave* court concluded that "Congress has given no clear indication that [a tax exemption for non-Indian lessees] was desired." *Id.* at 1256. "When such a signal is given, the state and local governments must retreat." *Id.*

### 3. *Bracker* and its Progeny Abrogate *Agua Caliente* and *Fort Mojave*

In *Bracker*, the Supreme Court "rejected the proposition that in order to find a particular state law to have been preempted by operation of federal law, an express congressional statement to that effect is required." 448 U.S. at 144, 100 S.Ct. 2578. The court noted that "[t]he unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law." *Id.* at 143, 100 S.Ct. 2578, 2584. In the 1982 case, *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of New Mexico*, the Supreme Court reiterated that, in the context of commercial activity by non-Indians on an Indian reservation, "ambiguities in federal law should be construed generously, and federal pre-emption is not limited to those situations where Congress has explicitly announced an intention to pre-empt state activity." 458 U.S. 832, 838, 102 S.Ct. 3394, 3399, 73 L.Ed.2d 1174 (1982). The *Ramah* court noted that in *Bracker* it had "flatly rejected" the argument that a state tax is not preempted where federal statutes and regulations do not specifically express the intention to do so. *Id.* at 843, 102 S.Ct. 3394, 3399.

Subsequent *post-Bracker* Ninth Circuit decisions have followed suit. *See Confederated Tribes of Siletz Indians of Oregon v. State of Oregon*, 143 F.3d 481, 486 (9th Cir.1998) ("[I]n the Indian law context, state law is preempted not only by an explicit congressional statement—but also if the balance of federal, state and tribal interests tips in favor of preemption.") (internal citation and quotation marks omitted); *Cabazon Band of Mission Indians v. Wilson*, 37 F.3d 430, 433 (9th Cir.1994) ("In balancing these federal, tribal, and state interests, no specific congressional intent to preempt state activity is required; it is enough that the state law conflicts with the purpose or operation of a federal statute, regulation, or policy.") (internal citation and quotation marks omitted).

In *Mescalero Apache Tribe v. Jones*, the Supreme Court held that permanent improvements on land owned by the United States and held in trust for Indians could not be taxed as a matter of federal law. 411 U.S. 145, 158, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). The court reasoned that "it has long been recognized that 'use' is among the 'bundle of privileges that make up property or ownership' and, in this sense, at least, a tax upon 'use' is a tax upon the property itself." *Id.* (internal citation omitted). The court noted that "[t]his

is not to say that use taxes are for all purposes to be deemed simple ad valorem property taxes," but rather that "use of permanent improvements upon land is so intimately connected with use of the land itself that an explicit provision relieving the latter of state tax burdens must be construed to encompass an exemption for the former." *Id. Mescalero* repudiated the reasoning in *Agua Caliente* that a tax on the "use" of the land is "not a tax upon the property itself." 442 F.2d at 1187. While *Fort Mojave* relied in part on *Mescalero*, the *Fort Mojave* court did not address this issue. 543 F.2d at 1256 (relying on *Mescalero* only for the proposition that traditional tax immunities had not been expanded or reduced by section 476).

In sum, the holdings in *Agua Caliente* and *Fort Mojave* were predicated on the lack of express congressional purpose to preempt a possessory interest tax of non-Indian lessees of Indian land. This reasoning has been repudiated by *Bracker* and its progeny, which make clear that no specific congressional intent to forbid a state or local tax on non-Indians on Indian land is required to find federal preemption. *Bracker* requires a "particularized inquiry" into the federal, tribal, and state interests at stake, which was not adequately undertaken in those cases. 448 U.S. at 145, 100 S.Ct. 2578. This is the case even where the relevant federal enactments are vague or ambiguous. *Id.* at 143, 100 S.Ct. 2578, 2584. ("[T]raditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop,' against which vague or ambiguous federal enactments must always be measured."); *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 177,

109 S.Ct. 1698, 1708, 104 L.Ed.2d 209 (1989) ("although state interests must be given weight and courts should be careful not to make legislative decisions in the absence of congressional action, ambiguities in federal law are, as a rule, resolved in favor of tribal independence.")

Moreover, *Agua Caliente* and *Fort Mojave* examined a select few provisions of the IRA and United States Code for preemption purposes. These cases do not establish conclusively that a possessory interest tax on non-Indian lessees is not and never will be preempted by federal law. Statutes and regulatory schemes other than those examined in those cases may provide a basis for preemption, particularly those issued in the four intervening decades. The legal landscape has changed since *Agua Caliente* and *Fort Mojave* were decided, and therefore this Court is not bound by those decisions.[4] *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir.2003) (*en banc*) ("[C]ircuit precedent, authoritative at the time that it issued, can be effectively overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly overrule the prior circuit precedent."); *see also Lair v. Bullock*, 697 F.3d 1200, 1206 (9th Cir.2012) (confirming that this standard applies to district courts).

## C. Section 465

Section 465 of the IRA authorizes the Secretary of the Interior to acquire "lands, water rights, or surface rights to lands" and hold them in trust for Indian Tribes. 25 U.S.C. § 465. The statute provides that "such lands or rights shall be exempt from State and local taxation." *Id.*

---

4. Defendants cite to *Palm Springs Spa, Inc. v. County of Riverside*, 18 Cal.App.3d 372, 95 Cal.Rptr. 879 (1971), which also held that a possessory interest tax on a leasehold was not preempted by federal law. (MJP at 11-12; MJP

Reply at 2.).*Palm Springs Spa* is inapposite for the same reasons explained above, and because state appellate court cases are not binding on this Court.

In *Mescalero*, the Supreme Court construed section 465 to mean that permanent improvements on land held in trust by the United States could not be taxed. 411 U.S. at 158, 93 S.Ct. 1267. In *Confederated Tribes of Chehalis Reservation v. Thurston Cnty. Bd. of Equalization*, the Ninth Circuit specified that, under *Mescalero* and section 465, state and local governments did not have the power to tax permanent improvements built on land held in trust for Indians, regardless of ownership. 724 F.3d 1153, 1154 (9th Cir.2013) (section 465 preempted a county tax on a non-Indian-owned ski lodge located on lands held in trust for the Chehalis Tribe by the United States).

The *Chehalis* court declined to apply the *Bracker* balancing test on the ground that the tax at issue was definitively preempted under section 465 and *Mescalero*, and thus no further preemption analysis was necessary. *Id.* at 1159.[5] The court noted, in a footnote, that section 465 does not apply to a possessory interest tax, but did not rely on this point in making its ruling. *Id.* at 1158, n. 7. Neither *Agua Caliente* nor *Fort Mojave* addressed section 465 in any way.

The *Chehalis* court briefly addressed 25 C.F.R. § 162.017(a), which expressly prohibits taxation of permanent improvements on leased land without regard to ownership of those improvements. *Id.* The court reasoned that, "[b]ecause this regulation merely clarifies and confirms what § 465 already conveys, we need not reach the applicability of this regulation or the level of deference owed to the Bureau of Indian Affairs in this context." *Id.* (internal citation and quotation marks omitted). The

court did not address section 162.017(c), and whether it clarified the applicability of section 465 to possessory interests.

■ A district court is not bound by *dicta* from an appellate court decision. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 737, 127 S.Ct. 2738, 2762, 168 L.Ed.2d 508 (2007) (courts "are not bound to follow ... dicta in a prior case in which the point now at issue was not fully debated.") (internal citation and quotation marks omitted); *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 805 (9th Cir.2012) ("A hypothetical that is unnecessary in any sense to the resolution of the case ... does not make precedential law. Accordingly, it is not binding."); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935) ("[E]xpressions [of the court] beyond the point involved ... do not come within the rule of stare decisis [and] dicta .... may be followed if sufficiently persuasive but ... are not controlling.").

The Supreme Court's reasoning in *Mescalero* suggests that a tax on the "use" of land is "a tax upon the property itself," supporting the contention that a possessory interest tax would be considered a tax on "lands or rights" under section 465. 411 U.S. at 158, 93 S.Ct. 1267. This is particularly compelling in light of the recent promulgation of section 162.017(c), which purports to clarify that leaseholds and possessory interests are not subject to state taxation of any kind. Nonetheless, the Ninth Circuit's commentary in *Chehalis* guides this Court in divining the

---

5. In discussing the *Bracker* test, the *Chehalis* court noted that, even before *Bracker*, *Fort Mojave* and *Agua Caliente* applied a "similar mode of analysis." 724 F.3d at 1158. The court then concluded that none of these cases implicated section 465, and were therefore inapplicable to the tax at issue in *Chehalis*. *Id.*

The *Chehalis* court's passing assertion that *Fort Mojave* and *Agua Caliente* apply reasoning "similar" to *Bracker* does not alter this Court's determination that *Bracker* abrogated the reasoning in *Agua Caliente* and *Fort Mojave* such that they are not controlling in this case.

proper application of federal law, and *Chehalis* asserts that section 465 does not, on its own, preempt a possessory interest tax. Thus, the Court need not decide this question for present purposes, but will examine the more recent BIA regulatory scheme found at 25 C.F.R. § 162 *et seq*, which was not considered in *Chehalis*.

### D. 25 C.F.R. Section 162.017

As noted above, the BIA recently issued a new set of regulations regarding the leasing of Indian land, including 25 C.F.R. section 162.017, which states that "[s]ubject only to applicable Federal law, the leasehold or possessory interest is not subject to any fee, tax, assessment, levy, or other charge imposed by any state or political subdivision of a state." 25 C.F.R. § 162.017(c). The preamble to the regulation published in the Federal Register ("Preamble") expressly states that the federal regulatory scheme for Indian leasing is comprehensive and precludes state taxation. 77 Fed. Reg. 72440-01 (Dec. 5, 2012).

The Preamble explains that this regulation was promulgated in order to provide "clarification" of taxation issues arising in the context of leasing Indian land. *Id.*; *see Gunderson v. Hood*, 268 F.3d 1149, 1153–54 (9th Cir.2001) ("agencies issue interpretive rules to clarify or explain existing law or regulations so as to advise the public of the agency's construction of the rules it administers."). The Preamble describes the *Bracker* test, noting that, "[i]n the case of leasing on Indian lands, the Federal and tribal interests are very strong." 77 Fed. Reg. 72440-01. The Preamble engages in a *Bracker*-like balancing, listing numerous federal regulations governing the leasing of Indian lands [6] and explaining that "[t]he purposes of residential, business, and WSR

leasing on Indian land are to promote Indian housing and to allow Indian landowners to use their land profitably for economic development, ultimately contributing to tribal well-being and self-government." *Id.* The Preamble asserts that "[a]ssessment of State and local taxes would obstruct Federal policies supporting tribal economic development, self-determination, and strong tribal governments" and that "State and local taxation also threatens substantial tribal interests in effective tribal government, economic self-sufficiency, and territorial autonomy." *Id.* If section 162.017 "clarifies" anything, it is that, under a *Bracker* analysis, a possessory interest is not subject to any state tax.

### 1. Applicable Federal Law

■ Defendants contend that section 162.017 does not preempt the PIT, because it is clearly established by "applicable Federal law" under *Agua Caliente* and *Fort Mojave* that a possessory interest tax on non-Indians leasing Indian land is not preempted by federal law. (Supp. MJP at 17.) This argument fails, as *Agua Caliente* and *Fort Mojave* are no longer controlling Ninth Circuit law on this issue. As discussed above, the reasoning in those cases that a tax on non-Indians operating on Indian land could not be preempted without express congressional intent was rejected by *Bracker*. There is no "applicable Federal law" holding that a possessory interest tax on non-Indian lessees is not preempted by federal law or otherwise contravening the express language of section 162.017.

Defendants contend that the balance of federal, state, and tribal interests that existed at the time *Fort Mojave* and *Agua Caliente* were decided has not changed, as

---

6. The Preamble lists 28 separate areas related to the leasing of Indian lands that are governed by federal law. 77 Fed. Reg. 72440-01.

the "legal incidence" of the tax continues to fall on non-Indian lessees. (MJP Reply at 7-8; Supp. MJP at 9-10.) To the contrary, the Supreme Court has determined that, "even when a State imposes the legal incidence of its tax on a non-Indian seller, the tax may nonetheless be pre-empted if the transaction giving rise to tax liability occurs on the reservation and the imposition of the tax fails to satisfy the *Bracker* interest-balancing test." *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 102, 126 S.Ct. 676, 681, 163 L.Ed.2d 429 (2005). The Ninth Circuit specifically declined to adopt the "legal incidence" test in *Ramah*, noting that "the economic burden of the asserted taxes would ultimately fall on the Tribe, even though the legal incidence of the tax was on the non-Indian ... company." 458 U.S. at 844, n. 8. The Supreme Court has held as recently as 2005 that it has applied the *Bracker* balancing test "*only* where the legal incidence of the tax [falls] on a nontribal entity engaged in a transaction with tribes or tribal members on the reservation." *Id.* at 686 (emphasis added) (internal citation and quotation marks omitted).

This is only further indication that the reasoning of *Agua Caliente* and *Fort Mojave* has been superseded by various Supreme Court and Ninth Circuit cases, including *Bracker*, *Wagnon*, and *Ramah*. The pervasiveness of the federal regulatory scheme is a factor in the *Bracker* balancing test, and a new regulation that purports to clarify the very issue at hand must be considered in assessing that balance.

## 2. Scope of BIA Authority

Defendants assert that, if section 162.017 "purports to preempt state possessory interest taxes, the regulation exceeds

the BIA's authority under federal law and is invalid." (Supp. MJP at 12.)

The power of the Secretary of the Interior [7] to promulgate regulations is broad, encompassing "the management of all Indian affairs and of all matters arising out of Indian relations." 25 U.S.C. §§ 2, 9; *see also United States v. Eberhardt* 789 F.2d 1354, 1360 (9th Cir.1986) ("We hold that the general trust statutes in Title 25 do furnish Interior with broad authority to supervise and manage Indian affairs and property commensurate with the trust obligations of the United States."); *Segundo v. City of Rancho Mirage*, 813 F.2d 1387, 1391 (9th Cir.1987) ("Leasing of Indian lands, whether tribally or individually owned, is authorized by 25 U.S.C. § 415(a)."). The Secretary of the Interior is "the government official charged by Congress with broad responsibility for the welfare of Indian tribes." *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1049 (9th Cir.2010) (citing 25 U.S.C. § 2 (Secretary of the Interior has management of all Indian affairs) and 43 U.S.C. § 1457 (Secretary of the Interior is charged "with the supervision of public business relating to ... Indians.")).

As a general matter, "an agency regulation with the force of law can pre-empt conflicting state requirements." *Wyeth v. Levine*, 555 U.S. 555, 576, 129 S.Ct. 1187, 1201, 173 L.Ed.2d 51 (2009). Numerous cases discussed in this Order have held that BIA regulations, in combination with federal statutes promoting policies of Indian self-governance and self-sufficiency, may preempt state and local laws. *See, e.g.*, *Chehalis*, 724 F.3d at 1154; *Gila River Indian Community v. Waddell*, 967 F.2d 1404, 1412 (9th Cir.1992) ("*Gila River I*");

---

7. The power is subsequently delegated to the Commissioner of Indian Affairs and the BIA under the direction of the Secretary of the Interior. 25 U.S.C. § 2.

*Hoopa Valley*, 881 F.2d 657, 661 (9th Cir. 1989); *Segundo*, 813 F.2d at 1393; *see also Bracker*, 448 U.S. at 139, 100 S.Ct. 2578; *Mescalero*, 462 U.S. at 334, 103 S.Ct. 2378.

■ An agency's interpretation of its own regulations is due considerable deference. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587, 120 S.Ct. 1655, 1663, 146 L.Ed.2d 621 (2000) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Nonetheless, a court is not required to defer to an agency's "proclamations of pre-emption." *Wyeth*, 555 U.S. at 576, 129 S.Ct. 1187. A court makes its own preemption determination "relying on the substance of state and federal law." *Id.* The BIA's assertions that these regulations "occupy and preempt the field of Indian leasing" and "preclude State taxation" are not binding or dispositive. 77 Fed. Reg. 72440-01. The Court instead examines the substance of the state and federal laws in assessing preemption, directing some attention to the BIA's analysis of the federal interests at stake. *Wyeth* at 576, 129 S.Ct. 1187, 1201 ("[W]e have not deferred to an agency's conclusion that state law is pre-empted. Rather, we have attended to an agency's explanation of how state law affects the regulatory scheme.")

■ In this case, the regulation at issue plainly states that a possessory interest in reservation land is not subject to any state tax. 25 C.F.R. § 162.017(c). To the extent that Defendants assess, levy, and collect a possessory interest tax on the lessees of the reservation trust lands, the federal and state laws are in direct conflict. Given the broad scope of the authority granted to the BIA, and its historic role in regulating the use of Indian reservation lands, particularly leases, Defendants have not presented convincing arguments that this regulation goes beyond the scope of the BIA's authority.[8]

■ A direct conflict between an agency regulation with the force of law and a state law might ordinarily end the preemption inquiry. *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir.2015) ("Conflict preemption is implicit preemption of state law that occurs where there is an actual conflict between state and federal law.") (internal citation and quotation marks omitted). As the Supreme Court has noted, however, "[t]he unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law." *Bracker*, 448 U.S. at 143, 100 S.Ct. 2578; *see also Gila River Indian Cmty. v. Waddell*, 91 F.3d 1232, 1236 (9th Cir.1996) ("*Gila River II*") ("The standard preemption analysis is inapplicable to

---

8. Defendants have cited various cases in which they claim that "the Supreme Court and Ninth Circuit have invalidated various Secretary of the Interior regulations applicable to Indians and non-Indians on Indian reservations on grounds that the regulations exceeded the Secretary's authority under federal law." (Supp. MJP at 6, n. 4.) These cases are distinguishable. *See Organized Vill. of Kake v. Egan*, 369 U.S. 60, 63, 82 S.Ct. 562, 564, 7 L.Ed.2d 573 (1962) (2 U.S.C. §§ 2, 9 did not delegate power to grant fishing rights to Indians who had not been provided with Reservations); *Yavapai-Prescott Indian Tribe v. Scott*, 117 F.3d 1107, 1111 (9th Cir.1997)

(permitting state taxation of on-Reservation hotel food and beverage sales and room receipts); *Gila River Indian Cmty. v. Waddell*, 91 F.3d 1232, 1237 (9th Cir.1996) ("*Gila River II*") (upholding state entertainment tax on events held on reservation). Defendants err in asserting that all of these cases hold that the regulations at issue exceeded the Secretary's authority under federal law. The court in *Organized Vill* held that the Secretary of the Interior did not have the power to grant the fishing rights at issue, but *Yavapai-Prescott* and *Gila River II* held only that the federal regulations did not preempt the state taxes in those non-analogous circumstances.

cases involving Indian law."). The *Bracker* balancing test remains the proper standard for assessing federal preemption of a state or local tax on the commercial activity of non-Indians on Indian land.

### E. *Seminole Tribe*

■ The Eleventh Circuit recently addressed the preemptive effect of sections 465 and 162.017 on taxation of non-Indian activity on Indian land. *Seminole Tribe of Florida v. Stranburg*, 799 F.3d 1324, 1337 (11th Cir.2015). The court in *Seminole Tribe* found that a tax on rent paid by non-Indian lessees for use of commercial space at casinos on reservation land was preempted by section 465. *Id.* at 1330. The court reasoned that "[t]he ability to lease property is a fundamental privilege of property ownership," relying on *Mescalero's* holding that "use" of property is part of the "bundle of privileges that make up property or ownership of property." *Id.* The court addressed the Ninth Circuit's contrary construction of section 465 in *Chehalis*, finding the "bare statement in the *Chehalis Reservation* footnote that § 465 does not apply to taxes on such interests" to be unpersuasive. *Id.* at 1334. District courts are "not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit to be." *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir.1981). As noted above, the Court reserves the applicability of section 465 to the PIT as not dispositive in this case, and declines to rule on it.

The *Seminole Tribe* court also examined sections 162.017(b)-(c), and found that the district court was correct in giving considerable deference to the BIA interpretation of the regulation in the Preamble, particularly given the "complex and extensive history of federal Indian law, and the thoroughness and persuasiveness of the [BIA]'s analysis." 799 F.3d at 1338 (citing

*Wyeth*, 555 U.S. at 576, 129 S.Ct. 1187). The district court, however, "went a step too far" in finding that section 162.017 on its own preempted lease-related taxation without engaging in a *Bracker* balancing of the federal, state, and tribal interests at stake. *Id.* The court found that the regulation and Preamble provided "substantial evidence of the extensive federal regulation of Indian land leasing to inform the *Bracker* balancing inquiry," but that, because the Preamble did not examine the state interests at stake, it could not "substitute for the particularized inquiry required by *Bracker*." *Id.* at 1338–39.

In this case, the Court will proceed to apply the *Bracker* balancing test with attention to the factors considered in *Bracker*, the application of the test in subsequent Supreme Court and Ninth Circuit cases, and the BIA's interpretation of how the state law affects the federal regulatory scheme.

### F. Application of the *Bracker* Balancing Test

■ The *Bracker* balancing test requires a "particularized inquiry" into the federal, tribal, and state interests at stake. While many courts applying the test have examined a substantial evidentiary record in weighing those interests, Defendants have moved for a judgment on the pleadings. Thus, the Court's application of the *Bracker* test here takes the facts alleged in the Complaint as true, construing all factual allegations in the light most favorable to the non-moving party.

#### 1. Federal Interest

■ As the Supreme Court instructed in *Wyeth*, courts may properly "attend ... to an agency's explanation of how state law affects the regulatory scheme" in conducting a preemption analysis. 555 U.S. at 576, 129 S.Ct. 1187. Given

both the "thoroughness and persuasiveness" of the BIA's analysis in the Preamble and "the complex and extensive history of federal Indian law," considerable deference is due to the agency's interpretation of the federal interests at stake. 799 F.3d at 1338. The Court will look to the purposes of the relevant federal laws, the comprehensiveness of the regulatory scheme, and the agency's analysis as expressed in the regulations and Preamble to determine the federal interests at stake.

### a. Purposes of the Federal Law

In conducting its analysis, the *Bracker* court looked to the stated purpose of the federal regulations at issue. 448 U.S. at 147, 100 S.Ct. 2578 ("Among the stated objectives of the regulations is the development of Indian forests by the Indian people for the purpose of promoting self-sustaining communities, to the end that the Indians may receive from their own property ... the benefit of whatever profit it is capable of yielding.").

The Preamble here states that "[t]he purposes of residential, business, and WSR leasing on Indian land are to promote Indian housing and to allow Indian landowners to use their land profitably for economic development, ultimately contributing to tribal well-being and self-government" and that "[a]ssessment of State and local taxes would obstruct Federal policies supporting tribal economic development, self-determination, and strong tribal governments." 77 FR 72440-01.

▮▮▮▮▮▮ A general statutory purpose of "creating a source revenue for Indian tribes" is not sufficient, on its own, to preempt a state tax. *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 180, 109 S.Ct. 1698, 1709, 104 L.Ed.2d 209 (1989). The overall purposes of promoting economic development, tribal well-being, and tribal self-determination may be weighed, however, by a court applying the *Bracker* test, particularly where the relevant agency has stated that the imposition of state taxes would frustrate such a purpose. *See Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 275, 112 S.Ct. 683, 697, 116 L.Ed.2d 687 (1992) ("this Court has made clear that the inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development.") (Blackmun, J., concurring in part and dissenting in part); *Cabazon v. Cabazon Band of Mission Indians*, 480 U.S. 202, 217, n. 19, 107 S.Ct. 1083, 94 L.Ed.2d 244 (congressional declarations of policy promoting the development and utilization of Indian resources in order to promote self-government and well-being are "particularly significant."); *Mescalero*, 462 U.S. at 334–35, 103 S.Ct. 2378 ("both the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes.") The federal government has an additional interest in achieving uniformity in the regulation and taxation of tribal leasing. *See* Preamble ("clarifying and making uniform the business leasing regulations injects more predictability, reduces costs, and increases transparency for investors.").

The purposes of the regulations weigh in favor of a strong federal interest in promoting the traditional goals of Indian self-sovereignty, economic development, and tribal well-being, as well as uniformity in the governance of tribal leasing.

### b. Comprehensiveness of Regulatory Scheme

The comprehensiveness of the regulatory scheme also weighs in favor of a strong federal interest. *Barona Band of Mission*

*Indians v. Yee*, 528 F.3d 1184, 1192 (9th Cir.2008) ("Federal interests are greatest when the government's regulation of a given sphere is 'comprehensive and pervasive.'") (internal citation omitted); *Bracker*, 448 U.S. at 148, 100 S.Ct. 2578 (state tax was preempted where "the federal regulatory scheme [was] so pervasive as to preclude the additional burdens sought to be imposed."); *cf. Cotton Petroleum*, 490 U.S. at 177, 109 S.Ct. 1698 (*Bracker* balancing weighed against preemption where federal and tribal governments did not "exercise comprehensive regulatory control" over on-reservation oil and gas production).

Indian leases are governed by an array of statutes, such as 25 U.S.C. § 415 (permitting Indian lands to be leased by Indian owners with the approval of the Secretary of the Interior), and regulations, such as 25 C.F.R. § 162 *et seq.* (promoting and regulating leasing on Indian land for housing, economic development, and other purposes). While it is unclear in this Circuit whether 25 U.S.C. § 465 (permitting the United States to hold lands in trust for Indians and prohibiting taxation of such lands and rights) is directly applicable to taxation of a possessory interest (*see* section C, *supra*), it makes up one of the many laws governing leased Indian lands, bolstering the comprehensiveness of the federal regulatory scheme.

The Preamble identifies 28 separate areas of Indian leasing which are regulated by federal law, including how to obtain a lease, lease duration, mandatory lease provisions, valuations, documentation required in approving, administering, and enforcing leases, which laws apply to leases, rental reviews or adjustments, and investigation of compliance with a lease, among others. 77 FR 72440-01. The federal statutory and regulatory scheme governing the leasing of Indian lands is detailed and comprehen-

sive. *See Bracker*, 448 U.S. at 149, 100 S.Ct. 2578 ("The imposition of the taxes at issue would undermine that policy in a context in which the Federal Government has undertaken to regulate the most minute details of timber production."); *Segundo v. City of Rancho Mirage*, 813 F.2d 1387, 1392 (9th Cir.1987) (rejecting contention that "federal statutes authorizing the leasing of trust lands and the regulations governing such leasing do not constitute a comprehensive regulatory scheme with preemptive effect on state and local law.")

■ Nonetheless, "[t]he mere existence of federal oversight over leasing of Indian lands" does not, on its own, invalidate state taxes on activities on the leased lands. *Gila River II*, 91 F.3d at 1237 (finding no federal preemption of state sales tax on entertainment events held by non-Indians on leased reservation land); *see also Salt River Pima–Maricopa Indian Cmty. v. State of Ariz.*, 50 F.3d 734, 736 (9th Cir.1995) (finding no federal preemption of state taxes on "the sale of non-Indian goods to a non-Indian by a non-Indian business on a reservation" where the Tribe did not contribute to the value of the goods and the state provided most of the government services used by the non-Indian taxpayers); *California State Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9, 10, 106 S.Ct. 289, 289, 88 L.Ed.2d 9 (1985) (upholding state excise tax on cigarettes sold to non-Indian purchasers); *Rice v. Rehner*, 463 U.S. 713, 715, 103 S.Ct. 3291, 3293, 77 L.Ed.2d 961 (1983) (upholding state liquor license requirement where Congress had delegated authority to States as well as Indian tribes to regulate the use and distribution of alcoholic beverages in Indian country). A possessory interest tax, however, is significantly more "intimately connected" to the use and possession of the land itself than taxes on the sale of goods or services, and there is a

demonstrable federal interest in the issue of leasing specifically. *Mescalero*, 411 U.S. at 158, 93 S.Ct. 1267. The federal regulation of the leasing of Indian lands (as opposed to the activities and services which take place on them) is both detailed and pervasive, and there is no indication that Congress has delegated any authority over the leasing of Indian lands to the States.

Of additional significance is the fact that the regulatory scheme at 25 C.F.R. § 162 *et seq.* expressly clarifies the BIA's interpretation of the federal interest at stake. It is well-settled by *Bracker* and its progeny that no express Congressional statement is required to find preemption, and that even ambiguous statutes or regulations are to be construed "generously." *Ramah*, 458 U.S. at 838, 102 S.Ct. 3394. Section 162.017(c) is not ambiguous in its proclamation that possessory interest taxes are prohibited and preempted. While not dispositive of the outcome of the *Bracker* balancing test, an express BIA regulation to the effect that (1) a state tax on possessory interests is specifically prohibited; (2) any additional taxation or regulation is preempted; and (3) "the Federal and tribal interests are very strong" is highly indicative of a significant federal interest that would be thwarted by the imposition of the County's tax.

### 2. Tribal Interest

It is well-settled that reduction of tribal revenues is not, on its own, sufficient to invalidate a state tax. *Gila River II*, 91 F.3d at 1239 ("the Ninth Circuit and Supreme Court have repeatedly held that reduction of tribal revenues does not invalidate a state tax.") (internal citations omitted). It is one factor, however, among others to be considered in the *Bracker* balancing test. *See Ramah*, 458 U.S. at 850–51, 102 S.Ct. 3394 ("The assessment of state taxes would throw additional factors into the federal calculus, reducing tribal revenues and diminishing the profitability of the enterprise for potential contractors."); *Cabazon*, 480 U.S. at 219, 107 S.Ct. 1083 (finding preemption of state law regulating on-reservation Bingo, reasoning that "[s]elf-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members.").

In this case, the Tribe has approximately 20,000 leases, from which it derives critical income for the provision of governmental services to tribal members. (Compl. ¶¶ 16-18.) The Tribe is also currently declining to collect its own taxes so as to avoid double taxation on its lessees in light of the PIT. (*Id.* ¶ 22.) The full extent of the financial burden on the Tribe cannot be assessed without a more developed factual record, but the facts as alleged are that the Tribe and its members have entered into thousands of leases providing considerable financial support to the Tribe, and that it is forbearing the imposition of its own taxes on these leases pending a determination of the issues presented in this case. This constitutes a strong tribal interest which would be frustrated by the imposition of the County's PIT.

Additionally, although *Agua Caliente* and *Fort Mojave* are not controlling as to the outcome of this preemption analysis, both courts found conclusively that the imposition of a possessory interest tax on non-Indian lessees has an "adverse economic effect" upon the Indian lessors. 442 F.2d at 1186; 543 F.2d at 1256. There is no reason to believe that the same is not true here.

### 3. State Interest

"The State's interest in exercising its regulatory authority over the activity in question must be examined and given ap-

propriate weight." *Ramah*, 458 U.S. at 838, 102 S.Ct. 3394. Numerous cases applying the *Bracker* test have found that, for a state or county's interest in a tax to outweigh strong tribal and federal interests, the tax must be "narrowly tailored" to funding the services it provides to the Tribe and the activity being taxed. *Gila River I*, 967 F.2d at 1412 ("a State may avoid the preemption of its taxing authority in a case where strong federal and tribal interests exist only if its taxes are 'narrowly tailored' to funding the services it provides in connection with the activities taking place on tribal land.") (internal citations omitted); *Hoopa Valley Tribe v. Nevins*, 881 F.2d 657, 661 (9th Cir.1989) ("To be valid, the California tax must bear some relationship to the activity being taxed."); *Crow Tribe of Indians v. State of Mont.*, 819 F.2d 895, 901 (9th Cir.1987) *aff'd sub nom. Montana v. Crow Tribe of Indians*, 484 U.S. 997, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988) ("Even if Montana's interests are sufficiently legitimate, there is substantial evidence that the coal taxes are not narrowly tailored to support them."); *cf. Cotton Petroleum*, 490 U.S. at 164, 109 S.Ct. 1698 (state tax appropriate where "the State provides substantial services to the Tribe and Cotton that justify the tax; the tax imposes no economic burden on the Tribe; and federal and tribal regulation is not exclusive.").

■■■ In such cases, a county's generalized interest in raising revenue is not sufficient. *Bracker*, 448 U.S. at 150, 100

S.Ct. 2578 ("We do not believe that respondents' generalized interest in raising revenue is in this context sufficient to permit its proposed intrusion into the federal regulatory scheme."). Nor is the general provision of services to the Tribe by the County. *Ramah*, 458 U.S. at 845, 102 S.Ct. 3394 ("We are similarly unpersuaded by the State's argument that the significant services it provides to the Ramah Navajo Indians justify the imposition of this tax. The State does not suggest that these benefits are in any way related to the construction of schools on Indian land."); *Seminole Tribe*, 799 F.3d at 1341–42 ("To establish the state's interest in imposing the Rental Tax, [Defendant] points to the evidence he introduced of the services that the state provides on the reservation, including law enforcement, criminal prosecution, and health services, as well as 'intangible off-reservation benefits ... such as infrastructure and transportation services.' But none of these services are tied to the business of renting commercial property on Indian land.")

■■■ According to the Complaint, the PIT at issue is a general revenue-generating tax that has no apparent connection to any services provided by Riverside County to the Tribe or its members.[9] (Compl. ¶ 24.) The majority of the revenues from the PIT are spent outside of the Tribe's Reservation, and a substantial percentage is spent outside the Coachella Valley altogether. (*Id.*) The County's general interest in raising revenue, weighed against a lack

9. Taking the allegations in the Complaint as true, and construing all allegations in the light most favorable to the non-moving party, there is currently no indication that the tax is connected to any services provided to the Tribe by Riverside County, or that the County provides any services to the Tribe at all. As the case proceeds, the County may attempt to demonstrate a direct connection between its tax and any services it provides to the Tribe.

See *Gila River I*, 967 F.2d at 1412 (finding that the Tribe had successfully stated a claim for preemption under *Bracker*, and that, "[a]lthough the State may at a later stage of the litigation seek to prove a direct connection between its tax and the law enforcement services it provides for the Firebird Lake performances, the record currently is devoid of any such proof.").

of connection between the services provided and the activity being taxed, is not sufficient to overcome the strong tribal and federal interests at stake.

■ For purposes of deciding this motion only, the Court finds that Riverside County's possessory interest tax on non-Indian lessees of the Tribe's reservation land is preempted under the *Bracker* balancing test.

### G. Collateral Estoppel and Res Judicata

Defendants' contentions that the Tribe's claims are barred by res judicata or collateral estoppel are unavailing. (MJP at 3-9.) The prior *Agua Caliente* case challenged the Riverside County PIT over forty years ago, and therefore res judicata simply does not apply. *See Haag v. Shulman*, 683 F.3d 26, 30 (1st Cir.2012) ("if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is res judicata as to any subsequent proceeding involving the same claim and *the same tax year*.") (emphasis added); *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 771 (9th Cir.2003) (res judicata not applicable where a different tax year is in question and there is a change in the law).

■ Similarly, collateral estoppel does not bar the Tribe's claims, given that both the factual and legal landscapes have altered in the intervening decades since both *Agua Caliente* and *Fort Mojave* were decided. "The principle [of collateral estoppel] is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially similar, factually and legally. It is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers." *C.I.R. v. Sunnen*, 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed.

898 (1948). "[A] subsequent modification of the significant facts or a change or development in the controlling legal principles may make [such a] determination obsolete or erroneous, at least for future purposes. *Id.*; *see also Carter v. United States*, 973 F.2d 1479, 1482–83 (9th Cir.1992) ("collateral estoppel is unwarranted if there has been a significant change in the legal climate" or a change in the "legally controlling facts.") (internal citations and quotation marks omitted).

### V.

### CONCLUSION

In light of the foregoing, Defendants' motion for judgment on the pleadings is **DENIED**. The parties shall meet and confer within two weeks from the date of this Order and file a joint status report, including new proposed trial and pretrial dates and deadlines (consistent with the Court's Scheduling Order [Doc. # 21 at 6] ), within one week after their meeting.

**IT IS SO ORDERED.**